## THE PEOPLE, *ex rel.* THE ATTORNEY GENERAL, *vs.* NAGLEE.

The state has the power to require the payment by foreigners of a license fee for the privilege of working the gold mines in the state.

The act of the legislature, prohibiting foreigners from working the gold mines, except on condition of paying a certain sum each month for the privilege, *held*, not to be repugnant to the constitution of the United States, or the constitution of this state, or the treaties of the United States with foreign powers.

Under the treaty of Querétaro, all Mexicans "established" in California on the 30th day of May, 1848, and who had not, on or before the 30th day of May, 1849, declared their intentions to continue Mexican citizens, are to be deemed American citizens.

The 13th section of the 11th article of the state constitution, which declares that taxation shall be equal and uniform throughout the state, applies only to direct taxation upon property, and does not prohibit the legislature from enacting license laws.

APPEAL from the superior court of the city of San Francisco. The proceeding in this case was an information in the nature of a *quo warranto* instituted by the attorney general against the defendant, the object of which was simply to procure the opinion of the court upon the constitutionality of the law requiring foreigners to pay a license fee of twenty dollars a

The People *v.* Naglee.

month for the privilege of working the gold mines in this state. The complaint alleged that the defendant had acted as a collector of license fees to foreign miners, and had exacted sums of money from different individuals, who were foreigners, for the privilege of working the gold mines of the state. A demurrer was put in to the complaint, and judgment was given in the superior court in favor of the defendant. From this judgment an appeal was taken. The cause was argued in this court by

*S. Heydenfeldt*, for the attorney general.

*Wm. Smith* and *E. Randolph*, for defendant.

*By the Court*, Bennett, J. The legislature, at its last session, passed an act, requiring foreigners, in order to entitle them to the privilege of mining in this state, to procure a license for that purpose, and prohibiting all foreigners, who had not such license, from working the mines.

It will be unnecessary to examine the questions in relation to the authority of the attorney general to institute the suit, and whether this form of proceeding is an appropriate method to test the constitutionality of the statute; inasmuch as we have to come the conclusion, that the judgment of the superior court should be affirmed, irrespective of the correctness of the respondent's positions upon these points.

The points on the part of the appellant, which will be considered, are, that the act of the legislature is in conflict; first, with the constitution of the United States; secondly, with treaties of the United States with foreign nations; thirdly, with the treaty of Querétaro in particular; and fourthly, with the bill of rights and the constitution of California.

First. Does the act in question violate the constitution of the United States? The appellant contends that it is an usurpation of the powers conferred upon Congress by that instrument. Before proceeding to an examination of this position, it is deemed advisable to recur to a few principles and rules of interpretation, which define the limits of the powers conferred upon

Congress by the constitution, and of those which the states still continue to retain. The general government, though supreme within its constitutional sphere, is yet limited in the objects of its jurisdiction, and in the extent of its authority. So far as the constitution has, either expressly or by necessary and unavoidable implication, conferred upon it exclusive powers, to that extent state rights and state authority are subordinate; but no farther than it can point out its authority in the constitution, does its jurisdiction extend—over everything beyond, state legislation is supreme. In determining the boundaries of apparently conflicting powers between the states and the general government, the proper question is, not so much what has been, in terms, *reserved* to the states, as what has been, expressly or by necessary implication, *granted* by the people to the national government; for each state possesses all the powers of an independent and sovereign nation, except so far as they have been ceded away by the constitution. The federal government is but the creature of the people of the states, and, like an agent appointed for definite and specific purposes, must show an express or necessarily implied authority in the charter of its appointment, to give validity to its acts. In order, therefore, to maintain the position, that a state has not the power to do a given act, which, without a transgression of international law, falls within the scope of the powers of any independent nation, it is necessary to show that such power has been transferred, by the constitution, from the state to the federal government. These principles are so well settled and so universally recognized and admitted, that it is scarcely necessary to cite authorities in support or elucidation of them. But we will refer to a few. They were foreshadowed by the *Federalist*, (*No.* 32, *p.* 143, *Ed. of* 1837,) even before the adoption of the constitution. It was stated in this, that the state governments would clearly retain all the rights of sovereignty which they had before the adoption of the constitution of the United States, and which were not by that act *exclusively* delegated to the United States. This exclusive delegation, or rather alienation of state sovereignty, would only exist in three cases; 1st, where the constitution, in express

The People *v.* Naglee.

terms, granted an exclusive authority to the union ; 2d, where it granted, in one instance, an authority to the union, and in another, prohibited the states from exercising the like authority ; and 3d, where it granted an authority to the union, to which a similar authority in the states would be absolutely and totally contradictory and repugnant. After the adoption of the constitution, so jealous were the states, lest their sovereignty should be entirely effaced by the general language of that instrument, that, at the first session of Congress, an amendment was proposed, which was subsequently ratified by the constitutional number of states, which declares, in explicit terms, that " the " powers not delegated to the United States, by the constitution, " nor prohibited by it to the states, are reserved to the states " respectively, or to the people." The judicial decisions of the supreme court of the United States, as well as of other courts, have not essentially varied the contemporaneous exposition of the constitution by the high authority of Hamilton. In *Calder* v. *Bull,* (3 *Dallas,* 386,) Judge Chase declared that the state legislatures retained all the powers of legislation which were not expressly taken away by the constitution of the United States. In *Sturges* v. *Crowninshield,* (4 *Wheaton,* 193,) the chief justice observed, that the powers of the states remained, after the adoption of the constitution, what they were before, except so far as they had been abridged by that instrument ; and in *Houston* v. *Moore,* (5 *Wheaton,* 48,) Mr. Justice Story, in the course of the clear exposition of the constitution, which he gave in that case, remarked, that the sovereignty of a state, in the exercise of its legislation, was not to be impaired, unless it was clear that it had transcended its legitimate authority ; and that no power ought to be sought, much less to be adjudged, in favor of the United States, unless it was clearly within the reach of its constitutional charter. " We are not," he adds, " at liberty to add one jot of power to the national government " beyond what the people have granted by the constitution." The same principle has been recognized in various other decisions on constitutional questions by the supreme court of the United States. (2 *Cranch,* 397 ; 3 *Wheaton,* 386 ; 2 *Peters,*

245 ; 16 *Peters*, 627, 655, 664 ; 11 *Peters*, 103, 132 ; 14 *Peters*, 579 ; 15 *Peters*, 509.)

These, then, being the rules, by which it is to be determined what the powers of the national government are, and what powers still remain with the states, it is necessary, in the next place, to inquire, how far the states have surrendered the power of taxation to the general government, and to what extent they still retain that attribute of independence and sovereignty. With the exception of exports, imports and tonnage, and such things as are held by the United States government, where its rights might be impaired if the property was taxed by the states, it seems to be conceded by most American jurists that the power of taxation exists in the states to the full extent in which it may be exercised by any sovereign nation. In support of this may be seen the following authorities : *McCulloch* v. *Maryland*, 4 *Wheaton*, 316, 425 ; *Gibbons* v. *Ogden*, 9 *Wheaton*, 1 ; *Providence Bank* v. *Billings*, 4 *Peters*, 561 ; *Brown* v. *Maryland*, 12 *Wheaton*, 441 ; 2 *Story's Comm. on Constitution*, 437 ; *License cases*, 5 *Howard*, 588. The power of taxation, in independent nations, is unrestricted as to things, and, with the exception of foreign ambassadors and agents, and their retinue, is unlimited as to persons ; and is deemed a power indispensable to their welfare and even their existence. The several states may, therefore, subject to the above restrictions, tax everything within their territorial limits, and every person, whether citizen or foreigner, who resides under the protection of their respective governments.

In the cases of *Norris* v. *The City of Boston*, and *Smith* v. *Turner*, (7 *Howard*, 283,) it was held by the supreme court of the United States, that, so long as foreigners emigrating to our country remained on board of the ships in which they were " imported," they were properly to be considered as embraced within that provision of the constitution which empowers Congress to regulate foreign commerce, and were, therefore, exempt from state taxation. But in those cases, it was conceded by the judges, as well by those of the majority as of the minority, that after the passengers had landed and become intermingled with

The People *v.* Naglee.

citizens, they were subject to be taxed by the state. In the case of *Smith* v. *Turner*, above cited, Mr. Justice McLean observes, (*p.* 405,) that, when merchandise was taken from the ship, and became mingled with the property of the people of the state, it was, like other property, subject to the local law, and that the *same rule applied to passengers.* And he adds, " when they " leave the ship and mingle with the citizens of the state they " become subject to its laws." Mr. Justice Catron, in the same case, (*p.* 452,) declares it to be a truism not open to denial, that the states may tax all persons and property within their respective jurisdictions, except in cases where they are affirmatively prohibited ; and he adds, " certainly the states may tax their " own inhabitants at discretion, unless they have surrendered " the power." Mr. Justice McKinley impliedly concedes the same thing, for he says, (*p.* 455,) " that passengers can never be " subject to state laws until they become a portion of the popula- " tion of the state, temporarily or permanently." These are the opinions of the judges who were in the majority and carried the restrictions upon the state power of taxation to the farthest verge. Those who were in the minority are even more explicit. The Chief Justice, in his opinion, says, (*p.* 491,) " it is admitted " that they, (passengers who were foreigners,) are not exempt " from taxation after they are on shore." Mr. Justice Daniel observed in substance, (*p.* 501,) that a tax upon a person placing himself within the sphere of the taxing power, was purely an exercise of the great indefeasible right of taxation, which had been explicitly said by that court would extend to *every subject,* but for the restriction as to imports and exports imposed by the constitution. The same judge again says, (*p.* 515,) that that court had asserted the power of taxation, with the single exception of taxes upon imports, to be the *perfect* and *undiminished* and *indispensable* power of a sovereign state. And Mr. Justice Woodbury, (*p.* 531,) declares it to be conceded, that if the tax in question in those cases, as a tax, had not been imposed till the passenger reached the shore, the objection to the validity of the law must fail.

The above, then, being the inherent power of taxation in

every independent community, and this power not having been parted with by the people of the states when they organized the federal government, it consequently extends to all persons within the territorial jurisdiction of the respective states, and embraces foreigners residing therein as well as citizens. The power being conceded, the limitation and extent thereof must, as to subject matter, persons, amounts, and times of payment, rest in the discretion of the government of each state; and if a state, enacting laws in pursuance of this acknowledged power, sees fit to impose the burden of taxation upon a portion of the persons within the sphere of its jurisdiction, and specially exempt others, its legislation, even though it might be unequal and unjust, would yet be no infringement of the constitution of the United States.

But it is claimed that the act of the legislature interferes with the power of Congress to make rules and regulations respecting the territory belonging to the United States. We are not aware that it has ever been supposed that individuals, living upon the public lands of the United States, whether as naked trespassers or claiming under a pre-emption right, were exempt from taxation by the state. A poll-tax upon them for state purposes, local taxes for highways, bridges, and objects of a like nature, have never, we apprehend, been deemed an interference with the power of Congress to make rules and regulations respecting the territory of the United States, even in those states where there has been an express provision in the Act of Admission, that the public lands should remain exempt from taxation while belonging to the United States, and for a certain period after they were sold. It can scarcely be doubted that our own state can, without any violation of this clause in the constitution —more especially as Congress has never attempted to avail itself of the exercise of the powers conferred upon it—levy a poll-tax to such extent as it might deem expedient upon all persons engaged in mining upon public lands, as well as upon the rest of her inhabitants; and if she might levy such tax upon all, there is nothing in the constitution of the United States, which deprives her of the power of imposing it upon a part only. Al-

The People *v.* Naglee.

though the state may not have the power to raise a revenue by direct taxation upon the public lands, or to make rules and regulations as to the surveying, leasing, or disposing of them, or as to the time or manner in which mineral lands may be worked, her power of taxation for police or municipal purposes, whether for the benefit of local districts or for the support of the state organization, must be co-extensive with the persons of all who enjoy the protection of her government, whether citizens or foreigners, whether occupying lands owned by themselves, or mining upon such portions as have not yet been severed from the national domain.   To hold the reverse of this would be to hold, that miners upon the public lands might remain exempt from taxation, and that the burdens of government must fall entirely upon the rest of the community.

It does not follow that the act in question can be deemed a rule or regulation respecting the public lands, because it may affect them indirectly, and may, to a limited extent, operate to prevent the working of them, and thereby diminish the revenue which might otherwise be derived from them by the United States.   To the general government is committed the power to regulate commerce with foreign nations, and among the several states ; and yet the states constantly tax things connected with foreign commerce and domestic trade, and thereby affect them to a considerable degree.   " They tax the timber, cordage, and " iron, of which the vessels for foreign trade are made ; tax their " cargoes to the owners as stock in trade ; tax the vessels as " property, and tax the owners and crew per head for their " polls."   And although taxes upon such objects should be imposed to such an extent as to injure commerce materially, and even thwart the purposes of the general government, they would still conflict with no clause in the constitution.   This was one objection raised against the license laws of Massachusetts, New Hampshire, and Rhode Island, (5 *Howard* 504, *et seq*.,) but the supreme court, unanimously, held that they were constitutional, though they evidently tended to diminish importations of spirituous liquors, and lessen the revenue of the general government from that source.   But that being only an incident to them, and

not their chief design, and the chief design being within the power of the states, the laws were upheld. So the statute under consideration, even though it may incidentally affect the public lands, that not being its main object, is unobjectionable on that ground.

But again, conceding that the law is one which prescribes rules and regulations respecting the territory of the United States, it does not necessarily follow that it is invalid. The constitution confers this power upon Congress, it is true, but it does not declare it to be an exclusive power. The exercise of a similar authority by the states is not expressly prohibited, and is not absolutely and totally contradictory and repugnant to the power of Congress. The case, consequently, does not fall within either of the classes mentioned in the *Federalist*, in which the states are said to be deprived of their previous attributes of sovereignty. Congress had neglected, and, so far as we have any authentic information, still neglects, to exercise the powers conferred by the clause under consideration; and, in the absence of all legislation by Congress, a statute like the one in question can scarcely be considered as infringing upon this dormant and unexecuted power of the general government. Had Congress established rules and regulations for the mines, with which this act was in conflict, there would be more plausibility in the objection of the appellant. But the statute itself provides for its own suspension, the moment Congress shall interfere. The latter clause of the 6th section provides, that " such " foreigners may take out a new license, at the same rate per " month, until the governor shall issue his proclamation an- " nouncing the passage of a law by Congress, regulating the " mines of precious metals in this state ;" and the 14th section is in the following words :—" It shall be the duty of the " governor, so soon as he shall have been officially informed of " the passage of a law by the United States Congress, as- " suming the control of the mines of the state, to issue his pro- " clamation, requiring all collectors of licenses to foreign miners " to stop the issuing of such licenses." There are many grants of power to Congress under forms of expression like the clause re-

The People *v.* Naglee.

specting the regulation of the public lands, which have been held not to confer upon the national government *exclusive* authority of legislation. Thus, Congress is empowered to provide for organizing, arming, and disciplining the militia; yet, in the absence of Congressional legislation upon the subject, the state may exercise the same authority. (*Houston* v. *Moore*, 5 *Wheat.* 1, 49.) Congress has exclusive power to regulate commerce; and yet, in *Wilson* v. *The Blackbird Bridge Company*, (2 *Peters*, 245,) an act of a state legislature affecting commerce was held valid. In this case the Chief Justice observes, " if Con- " gress had passed any act which bore upon the case, any act " *in execution of the power* to regulate commerce, the object " of which was to control state legislation over those small na- " vigable creeks into which the tide flows," &c., " we should " feel much difficulty in saying that a state law coming in con- " flict with such act would be valid. But Congress had passed " no such act." Congress has power to establish uniform bankrupt laws; and yet, in *Sturges* v. *Crowninshield*, (4 *Wheat.* 122, 192,) it was held that a state had authority to pass a bankrupt law, provided such law did not impair the obligation of contracts, and provided there was no act of Congress in force to establish a uniform system of bankruptcy conflicting with such law. Congress has power to provide for the punishment of counterfeiting the current coin of the United States; but, in *Fox* v. *The State of Ohio*, (5 *Howard*, 410,) it was held that this provision did not prevent a state from passing a law to punish the offense of circulating counterfeit coin. Why, then, has not this state the power, in the absence of all Congressional legislation, to pass a law which has no greater influence in *regulating* the public lands within the state, than the statute under consideration?

There can scarcely be a doubt that a state law imposing a tax upon the personal property of miners, such as their tools, machinery, provisions, and the gold extracted from the earth, would not amount to an usurpation, on the part of the state, of the constitutional power of Congress to make rules and regulations respecting the public lands; and it is difficult to see how

such a law would be less exposed to constitutional objections than a statute imposing a poll-tax.

The persons upon whom the statute of this state was intended to operate, do not come within the description of persons who were held to be exempt from state taxation in *Norris* v. *The City of Boston*, and *Smith* v. *Turner*, (7 *Howard*, p. 283.) They are not on shipboard in our harbors, nor transiently passing through our territory. They are confessedly within the territorial jurisdiction of the state, and residents, or, at least, sojourners upon our soil; and being such, can claim no exemption under the principle of those cases.

If, then, this statute is to be regarded as a tax-law, we are of the opinion that it conflicts with no clause in the constitution of the United States. Persons, whether citizens or foreigners, occupying mineral lands within the state, though such lands form a portion of the public domain, are, in respect to taxation, whether for the support of the state government, or for police or municipal purposes, subject to the legislative jurisdiction of the state. The power existing as to all, there is no prohibition in the constitution of the United States against exercising it over a part only, save that section which declares that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states. But that section does not affect the present case, as the act demands nothing from any citizen of the United States.

It being established, then, that the state may impose a tax upon the persons of foreigners alone, we think that the power may be exercised in the manner prescribed by this statute. In other words, if a tax-law be constitutional, a license law must be equally so.

We have thus far directed our attention to the constitutionality of the statute, as tested by the specific grants and prohibitions of power contained in the constitution of the United States, and have spoken of the law as one imposing a direct poll-tax upon foreigners. But we are of the opinion, that it should rather be viewed in the light of an act prescribing certain conditions, upon compliance with which, foreigners are to be per-

The People *v.* Naglee.

mitted to reside in a given locality, and pursue a particular branch of business. It is, in truth, what it purports to be, a license law. It was decided in *Holmes* v. *Jennison*, (14 *Pet.* 540,) in *Grove* v. *Slaughter*, (15 *Pet.* 449,) and in *Prigg* v. *The Commonwealth of Pennsylvania*, (16 *Pet.* 625,) that the people of the several states of the Union had reserved to themselves the power of expelling from their borders any person, or class of persons, whom they might deem dangerous to their peace, or likely to produce a physical or moral evil; and although the position assumed in those cases, that a law of Congress authorizing the introduction of any person or description of persons against the consent of the state, would be an usurpation of power, seems to have been overruled in *Norris* v. *The City of Boston*, and *Smith* v. *Turner*, yet these latter cases do not, as has already been observed, affect the act of the legislature now under consideration. The ground taken by Mr. Justice Woodbury in the cases last cited is, that every sovereign state possesses the power to prescribe the conditions on which aliens may enjoy a residence within, and the protection of, the state. This position is based upon the practice of nations, and of the respective states as well before as since the formation of the constitution, upon the authority of writers on international law, and the decisions of the supreme court of the United States, and is supported by a force and cogency of reasoning, which render it impregnable. And although he was in the minority in the decision of the court upon the peculiar facts of those cases, that circumstance, in no wise, impairs the force of his argument when applied to the statute, the validity of which is contested in this case. If, therefore, a state may prescribe the conditions upon which aliens may enjoy a residence within it, it may also declare the terms upon which they shall be permitted to make their residence in any given portion of its territory, and exercise a particular employment. This is the very thing which the law in question purports to do. It requires foreigners to pay a fee for permission to enjoy the protection of the state government in the mineral region, and in the pursuit of the lucrative business of mining. Viewed in this light, it may be regarded

as a police regulation, and therefore valid within the principles laid down in *Milne* v. *New York*, (11 *Peters*, 132,) and fortified by the views of the court in the *License cases*, (5 *Howard*, 504,) and in the *New York and Boston Passenger cases*, (7 *Howard*, 283.)

Nor do we see any great force in the objection, that the law is a license to foreigners to trespass on the public lands. We do not regard it as such. The state takes the case precisely as it finds it. It sees numerous foreigners actually engaged in mining. It looks to the fact that the general government permits them to trespass on the public lands without complaint, or any effort to prevent them from so doing, and it requires from them the payment of a fee, while so engaged, and until Congress shall assume some control over the matter itself. Instead of the law being a license to foreigners to trespass on the public lands, it is rather a restriction on the commission of such trespasses. Besides, the state is not the steward, nor bailiff, of the general government, having in charge the protection or security of the public property.

But it is contended that the act of the legislature is in violation of treaties of the United States with foreign powers. A sufficient answer to this general objection is, that the complaint does not set forth the nationality of any person upon whom the respondent is alleged to have exercised the functions of his office. It charges that he " has exacted the sum of twenty dol- " lars each from sundry foreigners in the county of San Francis- " co for licenses to mine"—without particularizing whether such foreigners were citizens of a nation with which the United States have any treaty relations. It does not state whether they were Mexicans, Chilenos, Englishmen, Frenchmen, Sandwich Islanders, or Chinese ; and the court cannot, upon this demurrer, determine whether any treaty has been violated by the respondent. This difficulty alone would, upon this branch of the plaintiff's argument, be a serious objection to his case : but inasmuch as it may be more satisfactory to have the whole matter, so far as this court is concerned, disposed of in all points upon the merits, rather than upon inadvertencies which might be supplied or corrected in a subsequent litigation, we shall proceed

The People *v.* Naglee.

to examine this position of the plaintiff's counsel. He insists that the act is invalid, because it is opposed generally to treaties of the United States with foreign powers, and particularly to the treaty of Querétaro.

First, as to treaties generally. Perhaps the most satisfactory mode of testing the validity of the law, under this point, will be to take the treaty with that power to whose subjects as extensive privileges are granted by our country as to those of any other nation. We will, therefore, consider the case as if it involved our treaty relations with Great Britain, and under the supposition that a subject of the Queen of Great Britain was the person from whom the sum of twenty dollars had been exacted. By the 14th article of the treaty of 1794, (known as Jay's treaty,) which was substantially renewed by article 1, of the treaty of 1815, the subjects of the King of Great Britain, coming from his majesty's territories in Europe, had granted to them liberty freely and securely, and without hindrance or molestation, to come with their ships and cargoes, to the lands, countries, cities, ports, places and rivers within our territories, and enter the same, to resort there, to remain and reside there, without limitation of time; and reciprocal liberty was granted to the people of the United States in his majesty's European territories; *but subject always, as respects this article, to the laws and statutes of the two countries respectively.* By this treaty, our inhabitants, whilst in the British dominions were to abide by the laws of Great Britain; and the subjects and inhabitants of that country, when in our territories, were to abide by the laws of the United States and by the laws of the respective states where they might be. The only question, then, under this treaty, is, whether the act of the legislature falls within the scope of the powers of a sovereign nation, and, at the same time, is not included in the category of powers granted by the states to the general government; for, if it falls within the former, and is excluded from the latter, then it is one of the laws which the treaty itself makes obligatory upon British subjects. But we have seen that the power of taxation, and the power of prescribing the conditions upon which aliens shall be

permitted to reside in a state, are attributes of a sovereign nation, which have not, except in certain specified cases, of which the present is not one, been given up to the federal government. Our statute, then, is one of the laws or statutes, to which the treaty, by its own terms, provides that the subjects of Great Britain shall be subject. Chief Justice Taney, in speaking of this treaty in *Norris* v. *The City of Boston*, and *Smith* v. *Turner*, (7 *Howard*, 472,) uses the following language: "The "permission there mutually given to reside and hire houses and "warehouses and to trade and traffic, is in express terms made "subject to the laws of the two countries respectively. Now "the privileges here given within the several states are all regu-"lated by *state laws*, and the reference to the laws of this coun-"try necessarily applies to *them*, and subjects the foreigner to "their decision and control." The act, then, is not repugnant to that treaty.

But even if the provisions of the statute did clash with the stipulations of that, or of any other treaty, the conclusion is not deducible that the treaty must, therefore, stand, and the state law give way. The question in such case would not be solely what is provided for by the treaty, but whether the state retained the power to enact the contested law, or had given up that power to the general government. If the state retains the power, then the president and senate cannot take it away by a treaty. A treaty is supreme only when it is made in pursuance of that authority which has been conferred upon the treaty making department, and in relation to those subjects the jurisdiction over which has been exclusively entrusted to Congress. When it transcends these limits, like an act of Congress which transcends the constitutional authority of that body, it cannot supersede a state law which enforces or exercises any power of the state not granted away by the constitution. To hold any other doctrine than this, would, if carried out into its ultimate and possible consequences, sanction the supremacy of a treaty which should entirely exempt foreigners from taxation by the respective states, or which should even undertake to cede away a part or the whole of the acknowledged

The People *v.* Naglee.

territory of one of the states to a foreign nation. In the License cases, (5 *Howard*, 613,) Mr. Justice Daniels, speaking of the provision of the constitution in relation to treaties, holds the following language: "This provision of the constitution, it is "to be feared, is sometimes expounded without those qualifica- "tions which the character of the parties to this instrument, "and its adaptation to the purposes for which it was created, ne- "cessarily imply. Every power delegated to the federal govern- "ment must be expounded in coincidence with a perfect right in "the states to all that they have not delegated; in coincidence, "too, with the possession of every power and right necessary "for their existence and preservation; for it is impossible to be- "lieve, that these ever were, either in intention or in fact, ceded "to the general government. Laws of the United States, in "order to be binding, must be within the legitimate powers "vested by the constitution. Treaties, in order to be valid, "must be made within the scope of the same power, for there "can be no *authority of the United States*, save what is derived "mediately or immediately, and regularly, and legitimately "from the constitution. A treaty, no more than an ordinary "statute, can arbitrarily cede away one right of a state, or of "any citizen of a state." It is not within the scope of a con- stitutional treaty to interfere with the reserved powers of taxa- tion and of control over foreigners, which we have above dis- cussed. No treaty, within our knowledge, has attempted to do it; and if such attempt should be made, the stipulation would, we apprehend, be neither recognized nor enforced by the supreme tribunal of the nation. "If," says Chief Justice Taney, (7 *Howard*, 466,) "the United States have the power, "then any legislation by the state in conflict with a treaty "or act of congress would be void. And if the states "possess it, then any act on the subject by the general govern- "ment, in conflict with the state law, would also be void, and "this court bound to disregard it."

And here let us remark that the questions which we have been examining are questions of *power*, and not questions of justice, or policy, or expediency. We hold that the *power* of

taxation over foreigners, as well as of determining the conditions on which they shall be permitted to enjoy the protection of the state in a particular place or occupation, is, in the language of the supreme court of the United States, " perfect and undimin- " ished and indispensable," and that it cannot be taken away or impaired by acts of Congress or treaties with foreign nations; and that the justice and expediency of tax and license laws must, so far as foreigners are concerned whilst residing within our territorial limits, be left to the discretion of the states re- spectively, to be exercised as the wisdom of their legislatures shall dictate, subject only to such restrictions as may be im- posed by the organic laws of the several states.

But it is especially objected to this statute, that it is in con- flict with the treaty between the United States and Mexico, known as the treaty of Querétaro. The eighth article of that treaty is in the following words :

" *Mexicans now established* in territories previously belong- " ing to Mexico, and which remain for the future within the limits " of the United States, as defined by the present treaty, shall " be free to continue where they now reside, or to remove at " any time to the Mexican republic, retaining the property " which they possess in the said territories or disposing thereof, " and removing the proceeds wherever they please, without " their being subjected, on this account, to any contribution, " tax, or charge whatever.

" Those who shall prefer to remain in the said territories, " may either retain the title and rights of Mexican citizens or " acquire those of citizens of the United States. But they " shall be under the obligation to make their election within one " year from the date of the exchange of ratifications of this " treaty; and those who shall remain in the said territories " after the expiration of that year, without having declared " their intention to retain the character of Mexicans, shall be " considered to have elected to become citizens of the United " States.

" In the said territories, property of every kind, now belong- " ing to Mexicans not established there, shall be inviolably

" respected.  The present owners, the heirs of them, and all
" Mexicans who may hereafter acquire said property by con-
" tract, shall enjoy with respect to it, guaranties equally ample
" as if the same belonged to citizens of the United States."

The ninth article is as follows :  " The Mexicans who, in the
" territories aforesaid, shall not preserve the character of citi-
" zens of the Mexican republic, conformably with what is sti-
" pulated in the preceding article, shall be incorporated into
" the Union of the United States, and be admitted at the pro-
" per time (to be judged of by the Congress of the United
" States) to the enjoyment of all the rights of citizens of the
" United States, according to the principles of the consti-
" tution; and in the meantime shall be maintained and pro-
" tected in the free enjoyment of their liberty and property,
" and secured in the free exercise of their religion without
" restriction."

Now, the palpable objection to the argument of the appel-
lant's counsel, founded upon any contrariety between the statute
and this treaty is, that it does not appear that the act has ever
been enforced against any person entitled to the benefit of this
treaty, or even against any citizen of Mexico.  But we waive
this, and treat the matter as if the complaint alleged the
Mexican nationality of the parties who claim to have been
aggrieved.

The eighth and ninth articles of the treaty above cited dis-
tinguish between two classes of Mexicans :  1st, those, who, at
the time of the adoption of the treaty, were " established" in
the territories ceded to the United States ;  and 2d, such as were
" not established there," but owned property within their
limits.  For the first class, provision is made in the first two
clauses of the eighth article and in the ninth article ;  and the
rights of the second class are defined in the last clause of the
eighth article.  It is not pretended that the statute conflicts, in
any respect, with this last clause, and we may, therefore, dis-
miss the description of persons therein mentioned from further
consideration.

The question then recurs upon the construction of the ninth

article and the first two clauses of the eighth; and it will be noticed that the Mexicans described therein as "established" in the ceded territories are of two descriptions; 1st, those, who should be free to remove at any time to the Mexican republic; and 2d, such as should choose to remain where they then resided. And here again there is no pretense that the rights of those Mexicans, who have chosen to remove, have in any way been infringed. It is then only the second description of persons last mentioned, in relation to whom there can be any conflict between the statute and the treaty. It must still further be observed, that even this class is again distinguished in the treaty into, 1st; those who should retain the title and rights of Mexican citizens; and 2d, those who should acquire the title and rights of citizens of the United States. But here again the appellant did not, and could not, claim that the privileges of the last mentioned first class, secured by the treaty, had been in any way prejudiced.

Having thus eliminated the case of all these descriptions of persons provided for by the treaty, but whose treaty rights neither are, nor were claimed to be affected by the statute, we are brought, finally, to the consideration of the real objection urged by the appellant.

This objection is founded solely upon the ninth article of the treaty. It will be observed that this article speaks of such Mexicans only as should not preserve the character of Mexican citizens; that is, of such as, conformably with the stipulations of the second clause of the eighth article, should prefer to acquire the title and rights of American citizens. Who are they? The same clause last referred to, declares that all Mexicans, remaining in the said territories, should make their election, within one year from the date of the exchange of ratifications of the treaty, whether they would retain the character of Mexican citizens, or acquire that of citizens of the United States; and that all those who remained in such territories, after the expiration of that year, *without having declared their intention to remain Mexican citizens*, should be *considered as having elected to become citizens of the United States.* The

The People *v.* Naglee.

exchange of ratifications of the treaty took place at Querétaro on the 30th day of May, 1848; and, consequently, all " estab- " lished" Mexicans who had not, on or before the 30th day of May, 1849, declared their intention still to continue Mexican citizens, have elected to become American citizens. Those who have declared such intention, if there be any, still remain aliens and foreigners, and as such are subject to the same restrictions by state authority as the subjects or citizens of any other foreign country. Those who have not declared such intention, are entitled to the privileges stipulated by the ninth article. But this class is specially excepted from the operation of the law in question by the first section of the act itself. Although the language of this section is not so closely in unison with the peculiar phraseology of the treaty as it might be, yet no one can doubt that, under a fair interpretation of it, all that class of persons designated in the ninth article of the treaty, were intended by the legislature to be, and in reality are, excepted from the operation of the act. This being so, the objection that the statute conflicts with this article of the treaty must fail.

We have thus far considered the act of the legislature, in reference to the constitution of the United States, and treaties with foreign powers generally, and the treaty of Querétaro in particular. We now proceed to test it by the constitution of our own state.

The appellant contends that the act is void under the seventeenth section of the first article of the constitution, which is as follows : " Foreigners who are, or who may hereafter become, " *bona fide* residents of this state, shall enjoy the same rights in " respect to the possession, enjoyment, and inheritance of pro- " perty, as native born citizens." Here again the ground upon which an argument against the statute could be based appears to be wanting. The complaint does not charge that the foreigners, from whom the respondent has exacted the license fees, had become or were *bona fide residents of this state;* and, although foreigners, unless they were *such* residents, neither they, nor the attorney general on their behalf, can avail themselves of this clause of the constitution. Again, it is not alleged that

they had any property, in the possession, enjoyment, or inheritance of which they were molested. On the contrary, the burden of the appellant's argument is, that they have been prevented, by this act, from availing themselves of the wealth of the public mineral lands of the United States. It is difficult to perceive how they could have any *property* in these lands to enjoy, possess, or inherit; and unless they had, this section of the state constitution could not apply.

There is more plausibility in the objection, which is founded upon the thirteenth section of the eleventh article of the state constitution, which is in the following words : " Taxation shall " be equal and uniform throughout the state. All property in " this state shall be taxed in proportion to its value, to be ascer- " tained as directed by law ; but assessors and collectors of " town, county, and state taxes, shall be elected by the qualified " electors of the district, county, or town, in which the property " taxed for state, county, or town purposes is situated."

Now, it will be noticed that, although the first clause of this section speaks of taxation in a general and unlimited sense, yet the subsequent clause refers only to direct taxation upon *property*. It requires all *property* to be taxed in proportion to its value. It says that assessors and collectors shall be elected by the electors of the district, &c. in which the *property* taxed is situated. We are of the opinion, that the first clause, when taken in connection with the latter, should be construed as limited to direct taxation upon *property*. And we are further inclined to the opinion that, in addition to this qualification, the section under review must be subjected to still greater restrictions and limitations. Our constitution was framed by intelligent and practical men, who were well acquainted with the organization and operation of the system of state government in all portions of the Union ; and when they declared, that taxation shall be equal and uniform throughout the state, they must have referred to such general taxation, as in the other states is commonly imposed alike upon all property for the purpose of defraying the expenses of the government of the state, or of some local municipal corporation. They could not possibly have in-

The People *v.* Naglee.

tended, that the entire aggregate amount of taxation upon persons or the value of property in every town and city of the state, should be equal to, and uniform with, the amount in every other town and city—that property in the city of San Francisco or in the city of Sacramento, for instance, should, in the aggregate, be burdened for state, county, town, and city purposes, with no greater assessments than the secluded *ranchos* in the country. If they did, they have given to us a perfectly impracticable instrument. But it is unnecessary now to decide, how far this clause may be properly extended; and it is alluded to here, only for the purpose of showing, that it could not have been intended by the convention that the constitution should cover so broad a ground as was claimed for it on the argument.

The statute in question, however, does not provide for what is commonly understood by the term tax, as is meant in the constitution by the term taxation. The word tax, in its common acceptation, denotes some compulsory exaction, which a government makes upon persons or property within its jurisdiction, for the supply of the public necessities. It is ordinarily assessed beforehand at stated periods, and collected at appointed times. Its payment is enforced, sometimes, by imprisonment of the person; at others, by the sale of property. The law in question, however, partakes of none of these qualities. It does not require the exaction, at all events, of any thing. The foreigner may pay, or need not pay, the specified amount, depending upon his own option whether he will, or will not, engage in mining operations. The amount is not assessed at all; it is not required to be paid at a definite time; and its non-payment is enforced neither by imprisonment nor sale of property. It is demanded only as often as a party of his own accord, chooses to perform certain acts. It is in the nature of a fee of a specific sum, exacted for licenses to sell certain goods or liquors, or to exercise certain trades, or to exhibit some curiosity, or for admission to certain privileges, or as a toll for the enjoyment of certain facilities, none of which is regarded in the light of a tax in the common acceptation of the term. It is a license fee, and not a tax; and unless the statute be constitu-

tional, we see not how any license law can be constitutional. But does any one doubt that the state may, for general purposes, exact license fees in the above and similar cases, or may empower counties, cities, and towns to demand them in order to defray their local expenses. We cannot believe, that it was the intention of the framers of the constitution not to grant such power to the state government.

It may be said that, under this construction, the legislature might abuse the power with which it is clothed by the constitution, to depress some departments of business and elevate others. But the same objection may be made to all other attributes of the legislative body. Power is always liable to be abused, to whatsoever individual or body of men it may be entrusted. The sure guaranty against the abuse of this power, as of all other powers, exists in the fact that an unjust, partial or impolitic law can, under our system of government, be but of short duration, after it shall have begun to re-act upon the people and lessen or destroy the business of the community.

Judgment affirmed.

