Lin Sing *v.* Washburn.

# LIN SING *v.* WASHBURN.

The Act of April 26th, 1862, entitled "An Act to Protect Free White Labor against Competition with Chinese Coolie Labor, and Discourage the Immigration of the Chinese into the State of California," is in violation of the provision of the Constitution of the United States which gives Congress the power to regulate commerce with foreign nations.

Per Cope, J.—The Federal Constitution has vested in the General Government the power to regulate commerce in all its branches; and this power extends to every species of commercial intercourse, and may be exercised upon persons as well as property.

Commerce cannot be carried on without the agency of persons; and a tax, the effect of which is to diminish personal intercourse, is a tax on commerce. If the power to impose such tax is acknowledged—it being a sovereign power—no limitation can be affixed to its exercise, and it may be so used as not only to diminish but to destroy commerce.

Immigration, either temporary or permanent, is an ingredient of intercourse and traffic; and the power to regulate commerce implies the power to regulate both as to persons and as to goods.

That branch of this power which relates to persons having been exercised by Congress in the passage of the various acts designed for the encouragement of immigration, without regard to nationality, is exclusively a prerogative of the Federal Government, and no State can exercise any part of it, except, perhaps, as the Government may assent to its exercise in particular cases.

The power asserted in the passage of the act in question is the right of the State to prescribe the terms upon which the Chinese shall be permitted to reside in it; and this right, if carried to the extent to which it may be carried, if the power exists, may be so used as to cut off all intercourse between them and the people of the State, and defeat the commercial policy of the nation.

The act cannot be maintained as a police regulation. This branch of the police power has been surrendered to the Federal Government as a part of the power to regulate commerce; and its exercise by a State is incompatible with the authority of the Government.

The question of the power of the States to exclude obnoxious persons, such as paupers and fugitives from justice, is not involved; for it does not appear that the Chinese as a class are of that description; nor does the act pretend to deal with them as such. They are not by the act denied a residence in the State, but are taxed for the privilege of residing here, without reference to their condition or character.

The Chinese may be taxed as other residents; but they cannot be set apart as special subjects of taxation, and be compelled to contribute to the revenue of the State in their character of foreigners.

Per Norton, J.—Under the decisions of the Supreme Court of the United States in the cases commonly called the Passenger Cases, (7 Howard) and *Brown* v. *The State of Maryland,* (12 Wheat. 419) any State law must be void, the purpose and effect of which is to prevent foreigners from coming to and residing in the State; and it would be an empty sound to say that the several States

Lin Sing *v.* Washburn.

cannot pass any law to prevent foreigners from coming here, if they may pass laws which will compel such foreigners to depart as soon as they arrive.

The question in this case is not the same as that in the case of *The People* v. *Naglee* (1 Cal. 232).

In that case, it was decided that a State law, requiring foreigners to take out a license for the privilege of working the mines, was constitutional, but not that they could be taxed merely for the privilege of residing in the State.

Per FIELD, C. J. dissenting.—The act in question is not in conflict with that clause of the Constitution of the United States which vests in Congress the power to regulate commerce with foreign nations.

The Passenger Cases commented upon, and the acts declared unconstitutional in those cases, distinguished from the act in question.

APPEAL from the County Court for the City and County of San Francisco.

The suit was brought originally before a magistrate, to recover five dollars, paid by the plaintiff, Lin Sing, a Chinese, to the defendant, Washburn.

Washburn was the Tax Collector for the City and County of San Francisco, and under the authority of an Act of the Legislature, passed on the twenty-sixth day of April, 1862, entitled " An Act to protect free white labor against competition with Chinese coolie labor, and discourage the immigration of the Chinese into the State of California," demanded of the plaintiff the sum of five dollars; two dollars and fifty cents thereof for the month of May, and two dollars and fifty cents thereof for the month of June, for the current year. The plaintiff refused to pay, whereupon Washburn, the defendant, proceeded to take the property of the plaintiff in order to satisfy said sum. To prevent this, the plaintiff paid the five dollars to Washburn, immediately redemanded it, and the payment being refused by the defendant, brought this suit, setting forth in his complaint the foregoing facts. Washburn demurred to the complaint, and the magistrate sustained the demurrer. The plaintiff appealed to the County Court, which affirmed the judgment below, and from this last judgment the plaintiff has appealed to this Court.

The object of this proceeding is to test the constitutionality of the law of April 26th, 1862, the title and first section of which are as follows.

" An Act to Protect Free White Labor against Competition with

Chinese Coolie Labor, and Discourage the Immigration of the Chinese into the State of California.

"The people of the State of California, represented in Senate and Assembly, do enact as follows.

"SECTION 1. There is hereby levied on each person, male and female, of the Mongolian race, of the age of eighteen years and upwards, residing in this State, except such as shall, under laws now existing, or which may hereafter be enacted, take out licenses to work in the mines, or to prosecute some kind of business, a monthly capitation tax of two dollars and fifty cents; which tax shall be known as the Chinese Police Tax; provided, that all Mongolians exclusively engaged in the production and manufacture of the following articles shall be exempt from the provision of this Act, viz: Sugar, rice, coffee, tea."

*H. P. Hepburn & John W. Dwinelle,* for Appellant.

Before discussing the grounds on which we shall contend that this law is unconstitutional, we propose to examine and ascertain what is the real object and intention of this law.

To do this, it is necessary to review the legislation of this State concerning the Chinese.

From 1850 till 1855 no discrimination was made putting Chinese on a different footing from other foreigners; all being obliged to pay alike the foreign miner's tax.

On the thirtieth of April, 1855, a law was passed fixing the rate of the foreign miner's tax at four dollars a month as to all foreigners "eligible to become citizens of the United States;" and as to all foreigners "ineligible to become citizens of the United States," augmenting it two dollars a month for every successive year, *ad infinitum.* (Acts of 1855, 216.)

As in a few years no human industry could pay the tax imposed by this law, it is manifest that the object of it was, not to impose a tax, but under the pretense of taxation, to drive the subjects of it —the Chinese—from the State.

This is made still more manifest by an act passed by the same Legislature, and only a few days before, to wit: April 28th, 1855.

This act subjected all ships, and the masters, owners and con-

Lin Sing *v.* Washburn.

signees thereof, to a tax of fifty dollars a head on every person imported by said ships into this State who was incapable of becoming a citizen thereof, or of the United States; and in order that there might be no mistake whatever about the object of the law, it was entitled: "An Act to Discourage the Immigration to this State of Persons who cannot become Citizens thereof." (Acts of 1855, 194.)

Here then we have two laws, both passed at the same session, the manifest and declared object of which was to drive from the country the Chinese who were in it, and to prevent others from coming to it.

An attempt having been made to collect from the owners of the ship "Stephen Baldwin" a large amount of money claimed to be due under this last law, the Supreme Court, on the authority of the Passenger Cases, (7 How. 122) declared it unconstitutional and void. (*People* v. *Downer*, 7 Cal. 169.)

Meantime the Legislature of 1856 repealed the flagrant Act of April 30th, 1855. (Acts of 1856, 141.)

Matters stood in this way till the twenty-sixth day of April, 1858.

On that day, an act was passed which declared as follows.

" On and after the first day of October, A. D. one thousand eight hundred and fifty-eight, any person or persons, of the Chinese or Mongolian races, shall not be permitted to enter this State, or land therein, at any port or ports thereof; and it shall be unlawful for any man or person, whether captain or commander, or other person, in charge of, or interested in, or employed on board of, or passenger upon, any vessel or vessels of any nature or description whatsoever, to knowingly allow, or permit, any Chinese or Mongolian, on and after such time, to enter any of the ports of this State, to land therein, or at any place, or places, within the borders of this State; and any person or persons violating any of the provisions of this act shall be held and deemed guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine in any sum not less than four hundred dollars, nor more than six hundred dollars, for each and every offense, or imprisonment in the county jail of the county in which the said offense was committed, for a period of not less than three months, nor more than one year, or by both such fine and imprisonment.

35

" SECTION II.—The landing of each and every Chinese or Mongolian person, or persons, shall be deemed and held as a distinct and separate offense, and punished accordingly."

The title of this Act is the fellow to its text: " An Act to Prevent the further Immigration of Chinese or ·Mongolians to this State." (Acts of 1858, 295.)

This act has never been repealed; but we have been informed from the Bench that an attempt was made to execute it; and that the Supreme Court, in an opinion which has never been reported, declared it unconstitutional and void.

Thus it stood till the twenty-sixth of April, 1862, when the Legislature passed the act, the constitutionality of which is now in question.

The object of the act of 1858, and of that of 1862, as is notorious, and as disclosed by the title of both, was the same : to prevent the immigration of the Chinese into California.

The tax of fifty dollars a head upon arrival in port had been proved to be abortive by the decision in the *People* v. *Downer ;* and to circumvent that decision, this tax was leviable on the Mongolian, not the moment before, but the moment after, he arrived. The Mongolian who arrives on the last day of the month, is taxed two dollars and a half the next day ; not because he is protected by the laws, which is the only legitimate ground of any tax, but because he is a Mongolian ; and if for this reason he can be taxed two dollars and a half the first month, with equal reason he can be taxed double that sum the second month, and so on *ad infinitum*, as was enacted in the Act of April 1855 ; and thus the law, if enforced, would inevitably accomplish its object—the Mongolians would be driven from the country.

The intention of a law is to be gathered from its title, its context, and from other laws on the same subject.   No one can read these and fail to see that they are all directed by the same spirit; hostility to the Chinese, and an intention to banish them from the country.

In 1856 the Legislature passed a law requiring a suit on a patent to be brought within two years from the date of the patent.   This law was declared unconstitutional, on the ground that, though the pretext was limitation, the intention was confiscation.   (*Lathrop* v. *Mills*, 19 Cal. 513.)

Lin Sing *v.* Washburn.

By this law the property of the Mongolians can be seized and sold to pay the amount claimed to be due; and if their property, why not their persons?

The moment you acknowledge the right of a State Legislature to tax a foreigner, because he is a foreigner, that moment you abandon to the States an absolute power over foreigners within their own limits. In the Passenger Cases, Mr. Justice Grier said: "A right to exclude is a power to tax; and the converse of the proposition is also true, that a power to tax is a power to exclude." (7 Howard, 461.)

What is the difference in principle between a tax of fifty dollars the day before you land, and a tax of fifty dollars the day after you land? If the power to do either be acknowledged, there is an end of the question; for if the power exists, it exists without limits. If two dollars a month will not exclude, two hundred will; and if two hundred will not, two thousand will; and so on.

In fine, this law asserts the proposition that it is competent to the Legislature of California to exclude the populations of Asia from migrating to California, and through California to the other States of this Union; and the question involved in this proposition is the question for the Court.

I. We maintain that the Legislature has no such power; that this law is in derogation of the grant of power in the Constitution of the United States to Congress, to lay duties on imports and to regulate commerce with foreign nations; and also in derogation of the power of the President of the United States, with the advice and consent of the Senate, to make treaties.

This is not a law to exclude a leper, a felon, or a vagabond, which a State by virtue of its police power may well do; but Mongolians. Who are they? A race whose ancestors were the followers of Attila, of Jenghis Khan and Tamerlane; for the latter, though he boasted of a being a Turk, was in reality a Mongol. "A race," said Gibbon, "whose rapid conquests may be compared with the primitive convulsions of nature, which have agitated and altered the globe;" a race whose dynasty has been imposed for hundreds of years, and which still reigns, over the richest and most populous empire under the sun; and whose language is spoken from Pekin

to the Caspian, and from the islands of the Indian Ocean to the heart of Siberia.

Shall we foster or discourage intercourse with this mighty people? The Legislature say that this is a question which is interesting merely to the citizens of California; but a very cursory examination will show that it is interesting to the people of the United States.

The Mongolians who are engaged in the production of sugar, rice, tea and coffee, are excepted from the oppression of this act. As to them, the Legislature are considerate enough not " to discourage the immigration of the Chinese into the State of California." But they might just as easily have refused to make the exception; and not alone for the present day, but for all time. Who can tell how many millions of acres of tea lands and rice lands are lying in fallow and waiting for " the Mongolian " between the eastern confines of California and the limits of our western civilization? Are the people of California, who hold within their hands alone the gates of entry of all the Asiatic populations to this country, to say now and forever by whom, and on what terms, the fields beyond their own borders shall be tilled? California may suppose it is to her interest to discourage " the competion of free white labor with Chinese coolie labor;" but the other States of this Union may find it to their interest not to discourage, but to encourage this competition. The question, then, is interesting not to one but to all, and should therefore be determined by all.

The gold and silver hills of Nevada Territory are now owned by the Government, and are free to the first comer. Their present possessors may therefore be opposed to the Chinese; but hereafter they may be owned, not by the Government, but by individuals, and then to attract the " Mongolian " and his cheap and willing toil, may be the wish and the interest of all its inhabitants. Is the State of California the Sovereign who shall then stand in the Golden Gate and say he shall not enter? Said Mr. Justice Grier, in his opinion in the Passenger Cases: " Twelve States of this Union are without a seaport. The United States have within and beyond the limits of these States many millions of acres of vacant lands. It is the cherished policy of the General Government to encourage and

Lin Sing *v.* Washburn.

invite Christian foreigners of our own race to seek an asylum within our borders, and to convert these waste lands into productive farms, and thus add to the wealth, population and power of the nation.   Is it possible that the framers of the Constitution have committed such an oversight as to leave it to the discretion of some two or three States to thwart the policy of the Union, and dictate the terms upon which foreigners shall be permitted to gain access to the other States ? ''

It is therefore apparent that the tolerance or intolerance of foreigners is a question which is interesting, not to the people of a State, but to the people of the Union ; and the power over the question should lie with the interest, that is to say with the Federal Government, and not with the State Governments.

Every sovereignty has the right either to exclude foreigners entirely, or to admit them on such terms as it shall see fit.   (Vattel book I, ch. 19, sec. 231 ; Id., book II, ch. 7, sec. 94 ; *New York* v. *Miln*, 11 Pet. 102.)

This right is so obvious and so necessary ; so universally recognized by all writers on public law, as well as by the custom of all civilized nations ; that it would be idle to dispute it.   But as in the United States, contrary to the habit and example of other nations, there is a complex, double sovereignty,—to the States a domestic or municipal sovereignty, and to the United States a foreign or national sovereignty,—the question is, to which of the two is the power allotted ?   That it ought to be allotted to the latter we have already shown ; and that it is, is established by the Constitution itself and the decisions under it.

The Constitution of the United States forbids the States to " lay any duty on imports or exports," and gives to Congress the power " to regulate commerce with foreign nations."   Repeated decisions of the Supreme Court of the United States have determined that this power in Congress was exclusive of any like power in the States.   (*Gibbons* v. *Ogden*, 9 Wheaton 186, 232 ; *Brown* v. *Maryland*, 12 Id. 438, 446 ; *Groves* v. *Slaughter*, 15 Pet. 511.)

None of these cases, however, decided that a man was an import, or that persons were the subjects of commerce.

The first time that that question was in any way considered was in the case of the *City of New York* v. *Miln* (11 Peters 102).

By an act of the Legislature of New York, masters and owners of ships were required, under a penalty, to furnish the Mayor with lists of the names, ages, occupations, etc., of the passengers brought by them into the port of New York : also to give a bond to indemnify the city against loss for their maintenance, etc. Miln was indicted under the provisions of this act, and demurred, on the ground that the act was a regulation of commerce, and therefore unconstitutional and void. The case went to the Supreme Court of the United States, who upheld the law, and decided that it was not a commercial, but a police regulation; Mr. Justice Barbour, who delivered the opinion of the Court, observing in the course of it, that persons were not the subjects of commerce. This case was decided in 1837, and no other case involving a like question arose till 1849, when the celebrated Passenger Cases were decided. These cases arose on two laws; one passed by the Legislature of New York, and one by the Legislature of Massachusetts. Both of these laws imposed a direct tax on alien passengers ; the former, a tax of a dollar on cabin, and a dollar and a half on steerage passengers ; and the latter, a tax of two dollars on each passenger ; to be paid, under both laws, by the master, owner or consignee of the ships.

The masters refusing to pay, suits were brought against them ; and they demurred, like Miln, on the ground that these laws laid duties on imports, and were regulations of commerce.

The question was then directly presented, whether a man was an import, and whether it rested with the States, or the Federal Government, to say on what terms foreigners should be admitted to enter the territory of the United States.

The cases were twice argued, and with distinguished ability ; and the Court, after great consideration, determined that these laws laid duties on imports, and were regulations of commerce, and were therefore unconstitutional and void.

Mr. Justice McLean, in delivering his opinion, said : " If the transportation of passengers be a branch of commerce, of which there can be no doubt, it follows that the act of New York in imposing this tax is a regulation of commerce. It is a tax upon a commercial operation ; upon what may in effect be called an import.

Lin Sing v. Washburn.

In a commercial sense no just distinction can be made, as regards the law in question, between the transportation of merchandise and passengers.    For the transportation of both, the ship owner realizes a profit, and each is the subject of a regulation by Congress." (7 Howard 405.)

Again he said : " A tax upon tonnage, merchandise, or passengers, is a regulation of commerce, and cannot be laid by a State except under the sanction of Congress, and for the purpose specified in the Constitution.    On the subject of foreign commerce, including the transportation of passengers, Congress have adopted such regulations as they deemed proper, taking into view our regulations with other countries ; and this covers the whole ground.    The act of New York, which imposes a tax on passengers of a ship from a foreign port, is a regulation of foreign commerce which is exclusively vested in Congress ; and the act is therefore void."    (Ib. 408, 409.    See also opinions of Justices Wayne and Catron to same effect.)

Miln's case, as an authority to the point that persons were not the subjects of commercial regulation, was distinctly and pointedly condemned.

Mr. Chief Justice Taney, who dissented from a majority of the Court, and contended that the power over persons was in the State, and not in the Federal Government, admitted that it must be exclusively either in the one or the other.    He said : " Neither can this be a concurrent power; and whether it belongs to the General, or to the State Government, the sovereignty which possesses the right must in its exercise be altogether independent of the other.    If the United States have the power, then any legislation by the State in conflict with a treaty or act of Congress would be void.    And if the States possess it, then any act on the subject by the General Government in conflict with the State law would also be void, and this Court bound to disregard it.    It must be paramount and absolute in the sovereignity which possesses it.    A concurrent and equal power in the United States and the States, as to who should not be permitted to reside in a State, would be a direct conflict of powers repugnant to each other, continually thwarting and defeating its exercise by either, and could result in nothing but disorder and confusion."    (Ib. 466.)

This, if we may be permitted to say so much, is the strongest argument which can be offered to show that the power should be lodged in the Federal Government.    One sovereignty would then be the representative of all, in a question interesting to all.    The law for one State would then be the law for all the States ; but all having an interest, all could be heard.    Then the foreigner could know by the only voice which he recognizes as the voice of the nation, (the laws of Congress and the treaties of the United States) whether he was welcome or unwelcome ; whether he would be received as a friend or trampled on as a dog.    But if thirty-four States combine together thirty-four distinct and independent sovereignties, (which is the proposition of this law) and each can lay down a different rule for the treatment of foreigners ; then indeed " nothing could result but disorder and confusion ; " then indeed " we may again witness the scene of conflicting commercial relations and exactions which were once so destructive to the harmony of the States, and fatal to their commercial interests abroad."

But it may be argued that there is a distinction between the acts of New York and Massachusetts and the act in question, in this : that the former taxed the foreigner before he landed, and the latter afterwards ; and that this last, a State in virtue of its general taxing power, has a right to do.    We have already shown that there is no real distinction between the two cases.    The law of 1855 was like the laws of New York and Massachusetts ; and was altered to its present shape merely to evade the principle of the Passenger Cases confirmed and vindicated in the *People* v. *Downer,* (7 Cal. 169). That this cannot be done has been solemnly decided by the Supreme Court of the United States, in the great case of *Brown* v. *The State of Maryland* (12 Wheaton 419).

In that case, a license tax of fifty dollars was imposed by the Legislature of Maryland on importing merchants who sold the goods imported by them by wholesale, in bales, packages or hogsheads. Brown, who was an importer and sold at wholesale, refused to take out a license, on the ground that the law was in effect a duty on imports, and a violation of the Constitution of the United States, which gave to Congress the power " to regulate commerce," and forbade the States to " lay duties on imports or exports."

The Courts of Maryland decided against Brown, and he appealed to the Supreme Court of the United States. This tribunal, in a unanimous opinion of unexampled power by the Chief Justice, (Marshall) declared the act of the Legislature of Maryland repugnant to the Constitution of the United States and void.

Both the authority and the principle of this decision have been fully vindicated and confirmed in the case of *Almy* v. *The State of California,* reported in 24 How. 169.

There is no difference between taxing a Mongolian, as such, after he lands, and taxing him before he lands. If the one is a " duty on imports," and a regulation of commerce," so is the other. All these laws assert the same proposition—the power of the Legislature to exclude the populations of Asia from migrating to California, and through California to other States of this Union.

The people of both Europe and Asia stand in the same light as to us; that is to say, they are both foreigners. Moreover, they can both become citizens of the United States. There are no words in the Constitution which limit the power of naturalization in Congress to whites. It is true, the Act of the first Congress of March 26th, 1790, confines the right of becoming citizens " to aliens being free white persons ; " but the word white in this act has been expressly decided to exclude negroes merely, and not Indians or other foreigners not negroes.

There is no just distinction before the law, between an Indian, an Asiatic, and a European. They are all alike foreigners, and can all alike become citizens ; and if one is the subject of commercial regulation by Congress, so is the other.

Moreover, Congress have expressly and repeatedly regulated this subject.

In a series of acts from 1799 to the present day, they have not only declared in substance that foreigners may enter free, but also that they may enter duty free their " wearing apparel and other personal baggage, professional books, instruments, and implements of trade," etc. (Mr. Justice Catron's opinion, 7 Howard 440, 441, 442.)

These acts apply to all foreigners ; but the present Congress, as if to rebuke the unconstitutional and unscrupulous legislation of this

State, on the nineteenth of February last, passed an act on the subject of the very immigration which is now in question. The first three sections relate to the coolie trade. After that comes section four, which reads thus: "And be it further enacted, that nothing in this act hereinbefore contained shall be deemed or construed to apply to or affect any free and voluntary immigration of any Chinese subject, or to any vessel carrying such person as passenger on board the same ; provided, however, that a permit or certificate shall be prepared and signed by the Consul or Consular Agent of the United States residing at the port from which such vessel may take her departure, containing the name of such person, and setting forth the fact of his voluntary emigration from such port or place, which certificate shall not be given until such Consul or Consular Agent shall be first personally satisfied by evidence.produced of the truth of the facts therein contained."

Here then is a direct authorization and· invitation to all subjects of the Chinese Empire, who see fit of their free will to come to the United States, to do so, upon the sole condition that they obtain a Consul's certificate that their emigration is voluntary.

Now what is the fact ? Under the authority of this law, they are seized the day they arrive ; their " wearing apparel, personal baggage, and tools, and implements," which they are entitled to enter free by act of Congress, are taken and sold to satisfy this tax. They are hunted everywhere, men and women ; the goods of merchants are taken to pay for those who have no goods ; they are detained on steamboats and highways, and made prisoners till they pay ; and in the mines they are tortured to discover gold dust which they do not possess ; all this, to drive Chinamen out of the United States, in the face of an act of Congress which invites them to come to the United States. " How is it possible," said Mr. Justice Catron, " to reconcile State laws laying heavy taxes on immigrant passengers, with this careful, studied, and ever-increasing security of immigrants against every legal burden or charge of any kind ? " (7 Howard 442.)

It may be objected that some restrictions are necessary in order to prevent an undue immigration of the Chinese. The answer to this is two-fold ; first, it is a question for Congress ; and second, if

Lin Sing *v.* Washburn.

they are to be excluded, the true way to do it is by a direct law, and not by a system of persecution. In the Passenger Cases, which involved the question of State restrictions on European Immigration, Mr. Justice Catron said : " We cannot take into consideration what may be or may not be the policy adopted or cherished by particular States. Some States may be more desirous than others that immigrants from Europe should come and settle themselves within their limits ; and in this respect no one State can rightfully claim the power of thwarting by its own authority the established policy of all the States united." (7 Howard 443.)

The question of encouraging or discouraging our connection with the East, and particularly with China and Japan, is not a local question, and presented for the first time to-day. It is vast and national in its proportions ; and to encourage and extend these connections has long been a cherished policy, not only of the Government of the United States, but also of every commercial nation of Europe. After many endeavors, fruitless till then, the Government of the United States, on the twenty-first of December, 1858, ratified with the Empire of China " a treaty of peace, amity and commerce." And on the twelfth of April, 1860, " the President of the United States of America, and his Majesty the Tycoon of Japan, desiring to establish on firm and lasting foundations the relations of peace and friendship then happily existing between the two countries, and to secure the best interest of their respective citizens and subjects, by encouraging, facilitating, and regulating their industry and trade, concluded a treaty of amity and commerce."

No one who reads these treaties can fail to see in every sentence the earnest and abiding interest of the Government of the United States to foster, facilitate, and extend the trade and intercourse of the people of the United States with the people of China and Japan. But, as was asked by Mr. Justice Grier, in his opinion in the Passenger Cases, " to what purpose commit to Congress the power of regulating our intercourse with foreign nations and among the States, if these regulations may be changed at the discretion of each State ? And to what weight is that argument entitled, that because it is the policy of Congress to leave this intercourse free, therefore it has not been regulated, and each State may put as many restrictions on it as she pleases ? " (7 Howard 462.)

At this very moment, and to promote the same object as the treaties, there is pending in the Congress of the United States a bill to establish a line of steamers " to run monthly, and in thirty-five days, from San Francisco, California, *via* the Sandwich Islands and Japan, to Shanghae in China."

This bill has attracted the support of the most enlightened classes in the Union.    The Board of Trade of New York has recommended it to the favorable consideration of the Board of Trade of Boston, Philadelphia, and other cities.    In so doing, they say : " In view of the growing intercourse with these countries, and the prospective demand for their staple products, there is a growing conviction in the minds of commercial men throughout the Atlantic States that the agency of steam must be used to facilitate the transportation of passengers, the mails, and certain species of merchandise, to and from our western shores, and the ports of China and Japan."

To crown all, the ink is hardly dry which approved the Pacific Railroad bill ; a vast national enterprise which is heartily approved by every Californian, and which will not only enlarge the trade and intercourse of Americans, but of Europeans also, with the Chinese.

How inconsistent, then, the Legislature of this State !  They want a railroad and steamers from the Federal Government to bring the Chinese to this country to trade with us ; but at the same time they pass laws to prevent them from entering when they come, and if they enter, to drive them out.    If the Chinaman came here like some of our nearer neighbors, a drone, refusing to work, living by vice, filling our hospitals and prisons, and augmenting our taxes, there would be no opposition to him.    But he works—works willingly—and most of all, works cheap.    This, his virtue, is his unpardonable sin.    The candidates for the wages of labor are not degraded by a competition with the tawny skins of Mexico, for they are idle and lazy.    But the Chinaman has arms which are full of strength, hands which are full of cunning, and instincts which incline him to honest toil.

When he enters the field, a real competitor appears, and the gorge of the American and the European rises ; " free white labor " is immediately degraded by competition with the yellow skin of the " Chinese coolie."    Then they contend with the Chinaman, not in

Lin Sing *v.* Washburn.

the fields of labor which are common to both, but in the forum of the Legislature where they only can be heard, and where the shortcomings of industry are eked out by persecution. Shall this base and shallow prejudice, founded in error, and at war with the true interests of the State, be permitted to thwart the policy of the National Government and trample its laws ? The spirit of encroachment by States and State laws, has been the cause of the present revolution. This spirit is not limited to the South ; for in the North the fugitive slave law alone has been the prolific mother of many State enactments defying its authority.

Nor is California an exception. Her Legislature has been rebuked by the Supreme Court of the United States, in *Almy* v. *The State of California*, (24 Howard 169) for imposing an export duty on gold ; and in despite of the Passenger Cases, and the *People* v. *Downer*, she still persists in taxing passengers. It is time that this spirit of usurpation should cease, and that the rights of the Federal Government should be respected. The Supreme Court of the United States is the tribunal which is invested with the ultimate power to do this. But in contests for political power, the value of its judgments lies chiefly in the moral support they receive from the people ; and this, if often appealed to, is sure to be weakened. How grave and high then, is the duty of the Supreme Courts of the States. The Judges of these Courts, unlike the Judges of the Federal Court, issue from amongst the people to whom they send their judgments. They are chosen by the same power which chooses the Legislature, and the people will reprobate a usurpation by the one, when it is expounded to them by the other.

Every judgment of this sort is an accession of strength to the federal fabric ; for the highest acknowledgment to power is submission to it, without requiring it to be exercised. The bulwark of our National Constitution is the Supreme Courts of the States, and when they fail the Supreme Court at Washington, its power as a political tribunal is gone.

The American scheme of a divided sovereignty, the first in the history of nations, had its root, not in the Federal Government, but in the States. They were independent before they were united States ; and experience has shown that the drift of power is not to their present, but to their original condition.

Our virtues and our vices, our interest, our influence, and our intelligence, all revolve in narrow orbits ; and thus the human race is divided into small families, not large ones.   Our government, which crosses a continent and runs almost from the torrid to the arctic zone, is an experiment against this law, and its day of trial has come.    It is now more important than ever to remember that the first condition of its success is, so to administer the Government of the States as not to interfere with the Central Government.

This cause could have been taken direct to the Supreme Court of the United States ; but as the ultimate power to resolve the law of California is not in the Legislature, but in this tribunal, it was deemed wiser, in view of what we have said, to invoke its judgment first.

II.    This law is a violation of the Constitution of the State of California.

Section seventeen of the first article of the State Constitution, better known as the " declaration of rights," declares that " foreigners who are, or may hereafter become, *bona fide* residents of this State, shall enjoy the same rights as to the possession, enjoyment, and inheritance of property as native-born citizens."

This puts a foreigner, in all things concerning property, on an equality with citizens.

As to citizens, article second, section thirteen, declares that " taxation shall be equal and uniform throughout the State."

In the face of this provision, can a direct head-tax be levied on one man and not on another ?    If it can, the Legislature can select classes who shall pay all the taxes of the State ; for the power, if it exists, can be exercised at the will of those who possess it ; and thus it would be an equal tax to require one man or class of men to pay all, and another man or class of men to pay nothing.   Foreigners and citizens being equal before the law, if such a rule could be imposed on foreigners, it could equally be imposed on citizens ; and thus the Legislature could select the citizens of one city or county to pay all the taxes of the State, and declare at the same time that the other citizens of the State should pay nothing.

Will a Court of Justice uphold a proposition like this ?    In the *People* v. *Coleman,* (4 Cal. 46) the words " equal and uniform "

were held to apply to " a direct tax on property," and not to extend to license taxes or taxes on occupations.   At the same time, the Court, remarking on this proposition, said that : " If the Legislature should pass an act designedly operating unequally, or if a want of uniformity in its operation was apparent on its face, it would be the duty of this Court to interpose, and prevent the commission of so grave an injustice."   Id. 56.

Here the " design to operate unequally " is declared in the title of the act.   The inequality is the whole object of the law.   The more it is unequal, the more it carries out the intention of the Legislature : under the pretext of taxation, which as near as may be should fall equally on all, they undertake to oppress and plunder a few ; and through the instrumentality of the tax-gatherer, are doing it with a high and cruel hand.

Can any case call more strongly on this Court to interfere and prevent " so grave an injustice ? "

*Frank M. Pixley, Attorney General,* for Respondent.

I.   The doctrine held by the Supreme Court of the United States, in 7th Howard, as announced by five Judges, (a majority of that Court) in the January term of 1849, is relied upon by the counsel in this case.

It is not contended that the " Passenger Cases " present the same questions, but that the principles therein involved are analogous to the case at bar.

That, if the law of New York which imposed a tax upon the " master of every vessel from a foreign port, for himself and each cabin passenger, one dollar and fifty cents ; for each steerage passenger, mate, sailor or marine, one dollar ; and twenty-five cents for each coasting vessel, for one voyage in each month, etc.," was in contravention of the laws of Congress and the authority of the General Government, which gave to Congress the right to regulate commerce ; that if it was unlawful, for quarantine purposes even, to tax passengers before they landed, then it must follow as a necessary consequence, we have no right in this State to impose a tax upon Chinese after they have acquired a domicil in the State, and become a part and portion of our inhabitants.

And in the case of Norris against the city of Boston—if the State of Massachusetts could not impose (as a protection against pauperism) "the tax of two dollars upon each alien passenger," and collect the same "against the ship which brought them," then this law is, and for like reasons involved in that case, void and unconstitutional.

While I shall contend that this case does not by any means present the same points for the consideration of this Court as are involved in the "Passenger Cases;" while I shall contend that the same questions of governmental and commercial policy are not at issue here, and that this case does not stand at all upon the principles therein involved; I desire to call the attention of this honorable Court to the history of those cases.

They were important ones: they involved the discussion of the question of State Sovereignty; whether Congress had the sole power to make laws regulating the commerce of the country; or whether the States had not with the General Government a concurrent power.

Whether the States had ever resigned to the General Government that portion of their sovereignty (so essential and necessary to their existence) which made them the sole judges of who should have the right of residence among them. Whether the States had yielded up to the Federal Government the power of designating what should be the character, the qualification and condition of its inhabitants.

Whether States occupying sea-ports could protect themselves from the burdens of pauperism by the imposition of protecting taxes.

I need not remind the Court of the character of counsel employed by the two States of New York and Massachusetts, the best names at the bar of either State—Messrs. Ogden, Prescott Hall, Mr. Davis, Willis Hall, John Van Buren, Rufus Choate and Daniel Webster—indicating that the principle was one of great importance, and that it involved questions of power and authority which those two great States determined not to part with, unless after a severe contest in the highest tribunal in the Government.

I need not remind this Court that a reargument was called for by the Supreme Court, until it seemed the subject had been ex-

Lin Sing *v.* Washburn.

hausted by the labor, the research and learning of the eminent gentlemen who gave to it their most careful study.

I need not call to mind this other fact, that those ·questions were finally decided by a divided Court, that a bare majority of one gave the final vote which determined those cases in favor of the central Government against the States, and that in that minority was the Chief Justice of the United States, who, in a most learned opinion, dissented, with Justices Daniels, Woodbury and Nelson, from the views of their associates.

I call the attention of the Court to this history for the purpose of showing how doubtful was regarded the right of the General Government even to the sole right of regulating foreign commerce, how careful was the Supreme Court of the United States before it decreed away from the individual States the exclusive power of regulating commerce within their jurisdictions ; in order to impress upon this Court the important fact, that if this case now at bar does not come fully and fairly up to the questions involved in the Passenger Cases, we are not to be embarrassed with that decision. I desire to insist that unless the appellants here present a case which comes in all its details, in every point or principle involved, and in every issue presented, fairly within the scope of that decision, then this law is to be upheld, and the legislation of the people of this State is to be maintained.

I am free to admit, that I very much incline to the opinion expressed by the Chief Justice and his associates, dissenting, as to the power and authority of the States, each for themselves, to determine whom they will receive as immigrants within their borders, who they will suffer to remain in association with their citizens, what class of persons they will admit to fellowship within their borders, and to participation with them in the benefits of the government they have instituted.

I am not an advocate of that broader doctrine of State Sovereignty, so much abused and distorted in the past years. I regard, however, the States as independent, in the management of their internal affairs ; that in everything which contributes to their tranquility they are the managers. That in all Police regulations they are supreme. The State must regulate all matters pertaining to

36

its public morals; the State must have the right to exclude paupers, criminals and dangerous persons, and the exercise of this power and discretion rests nowhere else than in the Legislative power. (*Prigg* v. *Penn*, 16 Pet. 625; 5 How. 629, 525; 14 Pet. 565; 11 Id. 142.)

The Police of the ocean belongs to Congress. The Police of the land belongs to the States. (*Manning* v. *Clark*, 5 How. 471.)

"This power existing absolutely in a State, it is for the State to decide what is sufficient cause to forbid a continued residence within its borders; and those considerations may be municipal or economical, as, for example, danger of pauperism, danger to health, danger to morals, danger to property, danger to public principles by revolutions and change of Government, or danger to religion." (Justice Woodbury, Pass. Cases, 529.)

If the State of California has not the right to decide as to whether Chinese should live in it, who has? Where should that power rest? Who besides ourselves is intelligent enough to exercise it? Shall Congress—a representative body of other States, who have no interest in this question; (where we have but five representatives) who are and of necessity must be ignorant of the questions involved; who never saw a Chinaman unless in an Eastern show-house—determine for us this question, so vital to the existence and happiness and prosperity of our own people; this question in which is involved the tranquility of our State, its business, its morals, its health and its religion? Shall Congress have the right to settle these barbarians in our midst, in defiance of our wishes; a class, of whom the Government will not make citizens; of whom it cannot make soldiers; who will not even permanently settle among us; who will not acquire property in our State to keep; who only come to pillage and depart?

II. I deem it most fortunate that this case does not depend upon the principles of the Passenger Cases. I deem it fortunate that this Court is not compelled again to thwart the wishes of the people of this State, expressed in legislation upon Chinese matters.

I am glad that we are able to place this argument upon another foundation; to sustain this law by invoking another power of sovereignty, which is ample enough to throw its protection over all laws

for the regulation of our Police and internal affairs ; that is, the power of taxation—a power enjoyed in common with the General Government—and yet a power in the exercise of which Congress has no right to inquire or interfere; a power incident to and a badge of sovereignty ; a power for the exercise of which we are responsible to none beyond our borders.

This Court will mark the wide distinction between the Passenger Cases and the one at bar.   In those cases, there can be no doubt there was on the part of the two States an attempted interference with the regulations of commerce ; they taxed the passengers while the ship was riding in the harbors of the Government, before the passengers had landed, before they had really come within the jurisdiction of the State authorities, before they had acquired a residence, and even before they had evidenced any intention of becoming residents, and while it was their probable intention to simply pass through the States of New York or Massachusetts on their way to the West.

These immigrants were white Christian people, capable of becoming citizens by naturalization under the laws of Congress; they came from governments with whom reciprocal treaties existed, and they came for the purpose of becoming citizens of our land, intending to forswear allegiance to their own governments, and to take upon themselves the duties and responsibilities of citizenship here ; they came for permanent residence, bringing their goods, their implements of trade, their wives and families.

Not so in the case of the aliens we have taxed by this law : they are no longer passengers, as they have left the ships that brought them; mingled with our people. They have become part and parcel of the inhabitants of the State, and as such become liable to taxation and to assessment for their share of the costs and burdens of the government whose protection and benefit they share.   They have ceased to be passengers ; they are no longer to be treated in their connection with commerce ; they have no further relation with it.

The Constitution of the United States provides against two things by the States.

1. They shall not lay any duty on tonnage without the consent of Congress.

2. No State shall lay any imposts or duties on imports or exports except by the consent of Congress.

Whether passengers are imports or not, I shall not stop to inquire, because my case is perfect in any aspect of the case growing out of that consideration.

If these Chinese when they were passengers could not be interfered with by State laws, because such interference would conflict with the regulation of commerce, to this it is sufficient answer to say that we have waited until they have dropped the character of passengers and assumed that of inhabitants.

Thus, we have not sought either directly or indirectly to lay any duty on tonnage, nor to collect any imposts on imports or exports; we have refrained from the most indirect interference with aliens coming from China, until they have dissolved their connection with every one engaged in commerce; have waited until they have merged themselves into the population of this State, mixed with the avocations of its people, and engaged in business pursuits under the protection of its laws.

This is now my proposition : I claim that the State of California enjoys the full municipal power to tax all persons within her territory, whether they have been here a year or a day.

There are exceptions to this rule, as in foreign Ministers, Consuls, &c.

Mr. Justice Catron says : " The States may tax all persons and property within their respective jurisdiction, except in cases where they are affirmatively prohibited. This is a truism not open to denial." (7 How. 452.)

Mr. Justice Grier admits that passengers may become subject to State laws when they become a portion of the population of the State, temporarily or permanently. (7 How. 455.)

Congress has undoubtedly a concurrent power with the States to levy taxes. Congress may impose a poll tax, or lay direct taxes upon persons and property; but while the General Government may enjoy this power, the same right is inherent in the States.

Chief Justice Taney elaborates this idea, and indeed it is not disputed. Says Judge Taney : " The power to levy taxes (by Congress) could never be considered as abridging the rights of the

State on that subject. The power granted to Congress to regulate commerce did not in any degree abridge the power of taxation in the States." (Passenger Cases, 480.)

Chief Justice Taney says: "The taxing power of the State is restrained only where the tax is directly or indirectly a duty on imports or tonnage." (7 How. 482.)

It cannot be claimed that taxing resident Chinamen is either directly or indirectly a duty on imports or tonnage.

The State possesses the power to tax all property, trades, pursuits and persons within her borders, as a part of her inherent sovereign power. She must always have that power as an incident of her sovereignty, unless she has expressly relinquished it to the General Government.

Chief Justice Marshall says: "That the taxing power of a State is of vital importance, and that it is essential to the existence of Government, are truths which it cannot be necessary to affirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed.

"We will not say a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, the community has a right to insist that its abandonment ought not to be considered in a case in which the deliberate purpose of the State to abandon it does not appear." (*Billings* v. *Providence Bank*, 4 Pet. 514.)

I submit, there is no evidence that the State of California ever intended to relinquish the privilege of taxing Chinese; but on the contrary, she has been very vigorous to devise laws for their taxation.

As to the right of States to impose taxes, it is held in *McCullough* v. *Maryland*, (4 Wheat. 425) that the power of taxation "is of vital importance to a State;" that it is retained by the States; that it is not abridged by a grant of similar power to the Union; that it is to be concurrently exercised.

"That the power of taxation remains in the States, concurrent and coextensive with that of Congress, the slightest attention to the subject will demonstrate beyond controversy." (Story's Com. vol. 2, § 937.)

Lin Sing *v.* Washburn.

Justice Taney says : "The State power of taxation is concurrent with that of the General Government, is equal to it, and is not bound to yield." (5 How. 582.)

Justice McLean says, in same case : "The power to tax is common to the Federal and State Governments, and it may be exercised by each in taxing the same property; but this produces no conflict." (License Cases, 5 How. 582 ; See also *Bank* v. *Billings*, 4 Pet. 561.)

Then I claim that the right to impose taxes upon all persons within our State is broad, comprehensive and complete, and only in the two particulars, "duties on imports or exports, and duties on tonnage," is it subject to any limitation.

That we have in our sovereign capacity the authority to impose taxes upon our people at pleasure ; if they are burdensome, oppressive and hard to bear, there is no other remedy for it than by an appeal to the Legislature.

Judge Daniels styles it the "great indefeasible right of taxation, extending to every subject, but for restriction as to imports and exports imposed by the Constitution ; a right, too, expressly declared to belong to a branch of power wholly different from the power to regulate commerce, and forming no part of that power." (Dissenting opinion in Passenger Cases.)

The concurrent power of the States with the General Government to impose taxes is settled by the following cases : *McCullough* v. *Maryland*, 4 Wheat. 316–425 ; *Gibbons* v. *Ogden*, 9 Id. 1 ; *Prov. Bank* v. *Billings*, 4 Pet. 561 ; *Brown* v. *Maryland*, 12 Wheat. 441 ; 4 Gill & Johns, 132 ; License Cases, 5 How. 588 ; *Weston* v. *Charleston*, 2 Pet. 449 ; Federalist No. 42.)

It may be claimed that taxing Chinese may prevent their coming, and therefore it is an interference with commerce—may interfere with the profit of ships. Any tax would have to its extent a similar effect.

This question is argued and settled in the License Cases, in 5th Howard's Reports.

This law does not interfere with the foreign voyage. The power of taxation has not been resorted to until the ship has left its passengers, and they have merged the character of passenger into that

of resident. It does not touch the tonnage of the vessel. It is not a tax on imports. Chinese are not imports; if they are, they came in violation of the revenue laws, as they came in free of duty. If they are, or were imports, they should have been appraised, and paid an ad valorem duty as nonenumerated articles of merchandise.

This tax does not amount to a regulation even of the traffic in Chinese or the trade, or the business of carrying passengers, and of the impost on imports, nor is it within the province of this Court to determine this tax burdensome, and not therefore to be imposed.

I believe enough has been said to convince this Court that at least there may be doubt whether the law ought to be disturbed; that it is not a proposition so very clear that we cannot tax this people from Asia who come among us; and if I have succeeded in lodging a doubt in the minds of this Court as to whether the law in question is unconstitutional or not, I have done enough to authorize an appeal to the well known rule for the decision of such cases as this, which is to give the benefit of the doubt to the support of the law.

"The question whether a law be void for its repugnancy to the Constitution, ought seldom if ever to be decided in the affirmative in a doubtful case. It is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the Judge feels a strong and clear conviction of their incompatibility with each other." (Justice Daniels, Pass. Cases, 496; Cranch 128.)

"The delicate office of declaring an act of the Legislature unconstitutional and void, should never be exercised unless there be a clear repugnancy between the inferior and organic law. Courts have no legislative powers; they are merely the organs of laws ready-made; they can do no more than construe and give effect to them." (*People* v. *Burbank*, 12 Cal. 384.)

This law does not prevent Mongolians from coming to the State; does not seek to prevent their departure; does not in any way pretend to interfere with the regulations of commerce.

It is passed by the Legislature under its power of taxation, as a means of deriving a proper proportion of revenue from this class of aliens.

We deny that it is intended, or that its effect will be, to drive Chinese and Mongolians from the State.

We claim that the tax is a fair and just one ; and that under the requirements of our Constitution " that taxation shall be uniform and equal," this law is defensible.

III.   The law is not in violation of the Constitution of this State.

The doctrine has been so fully and so emphatically settled in this State, that it needs but to call the attention of the Court to the case of the *People* v. *Naglee*, in 1st Cal., and the *People* v. *Coleman*, in 4th Cal., as a complete answer to all that has been urged upon this point.

The Supreme Court of California has determined that the power of the Legislature to tax trades, classes, professions and occupations, is a matter completely within its control, and rests in its sound discretion ; that the thirteenth section of the eleventh Article of the State Constitution, which provides " taxation shall be equal and uniform throughout the State," does not operate as a limitation on the taxing power of the Legislature, but is to be taken as applying only to direct taxation on property as such.   It does not require that all should be taxed alike.  The Legislature in its discretion may, therefore, discriminate in the imposition of taxes on certain classes of persons, occupations or species of property, taxing some and exempting others.

The point most relied upon by the counsel for the appellant, and to which nearly all his authorities are cited, viz : " The right of the General Government to regulate commerce with foreign nations and to make treaties," is one I have not sought to contravene, and for the purpose of this case do not deem it necessary to question.

I say the taxing of Chinese and Mongolian residents, after they have mixed with our people, after they have ceased to be passengers, not while they are in transit through the State, but when they have settled down to avocations within it, is in no sense an interference with any regulation of commerce.

This right rests in the taxing power of the State, which is supreme.

In the case of the *People* v. *Naglee*, Justice Bennett regards it as settled " that the State may impose a tax upon the persons of foreigners alone."

Lin Sing *v.* Washburn.

Further upon the question of taxing foreigners, Justice Bennett says: " It is a question of power, and not one of justice, or policy, or expediency.    We hold that the power of taxation over foreigners, as well as determining the conditions on which they shall be permitted to enjoy the protection of the State in a particular place or occupation, is, in the language of the Supreme Court of the United States, perfect and undiminished and indispensable; and that it cannot be impaired or taken away by acts of Congress or treaties with foreign nations, and that the justice and expediency of tax and license laws must, so far as foreigners are concerned, whilst residing within our territorial limits, be left to the discretion of the States respectively, to be exercised as the wisdom of their Legislatures shall direct, subject only to such restrictions as may be imposed by the organic laws of the several States."

This law is not in conflict with section seventeen of the first article of the Constitution, which says: " Foreigners who are or may become *bona fide* residents of this State, shall enjoy the same rights as to the possession, enjoyment and inheritance of property, as native-born citizens."

1. The Chinese is not a *bona fide* resident in any sense of the word; he will not even permit his bones to have sepulture in our soil.

2. This law does not interfere with the "possession," "enjoyment," or "inheritance" of property.

IV.    The treaty with China is referred to in the brief of counsel as a treaty of " Peace, Amity and Commerce."    So it is, and it is nothing more.    It contains no provisions conceding to Chinese the right to become citizens of this State.    It contains no letter authorizing Chinese to immigrate to California, and to mingle with its people, and engage in the various avocations of our special industry.

The treaty is intended for purposes of commerce and trade between the two Governments, and to preserve peace between them.

It provides how our officials may correspond with theirs; on what terms of trade intercourse may be had.    It restricts and designates the places where Americans may temporarily reside and do business.    It regulates official intercourse.    It provides how ship-

wrecked vessels may be treated; how ships touching at their ports may be provisioned; where Consuls and Commercial Agents may reside; defines their rules of intercourse and correspondence. It provides how offenses may be punished, houses rented, cemeteries protected, and where hospitals and churches may be built; that our merchants must pay their tariff duties on exports and imports and tonnage; comply with their port and harbor regulations. It provides for the collection of debts, employment of scholars, toleration of Christians, &c., &c.; but not one word which either directly or indirectly contemplates even the emigration of their people to our continent, or the contingency of their becoming inhabitants of this or any other State.

There is no provision which says they shall be placed on the footing of most favored nations, or that they shall enjoy the same privileges of emancipation, settlement and residence, as other nations.

Chinese exclusiveness never contemplated the possibility that its people would desire to leave the Flowery Kingdom.

*Patterson & Stow,* and *H. S. Brown,* also for Respondent.

We submit, that the solution of the question presented depends upon whether the statute is a police or a commercial regulation. If the former, it is clearly a valid law; if the latter, perhaps it may be open to some of the objections urged by the appellant.

It will be seen, from the language of the act, that it deals with a race of people; and taxes only actual residents within the jurisdiction of the State.

It does not assume any control or right to tax these people until they have voluntarily subjected themselves to the State laws—until they have placed themselves in a position to claim protection from the Government in their rights of property and person. Having thus placed themselves in the attitude where the Government is compelled to render them its benefits, by the same acts do they not become liable to bear its burdens?

The tax levied or imposed by this statute is not different in principle from the poll-tax of this State. (Wood's Digest, 634, Art. 3070.)

Nor is it as much liable to the suspicion of being opposed to the

constitutional provision relied upon by appellant, as the tax imposed upon all sales of "consigned goods," (Wood's Digest, 632, § 26 and following) because there the tax is upon foreign as well as domestic goods; and if it was fifty cents on the dollar of the value thereof, it would amount to a practical, as distinguished from a legal, prohibition of the importation of the manufactures of foreign countries.   Section twenty-eight of that act not only imposes the tax of fifty cents on each one hundred dollars of sales, but authorizes the consignee to deduct it from the proceeds of sales ; thus, in effect, directly imposing the tax upon the goods.   That act was early questioned, but was upheld by the Supreme Court, (4 Cal. 46, *People* v. *Coleman*) and was again under review in *Crosby* v. *Patch*, 18 Cal. 443, and sustained as a valid constitutional law.

We are unable to distinguish the case at bar from *The People* v. *Naglee*, (1 Cal. 236) and have carefully examined appellant's brief for an argument to overturn the principles of that case.   By that authority, it was adjudged that this State has power to tax everything within her territorial limits, and every person, whether citizen or foreigner, who resides under the protection of her government.

Keeping in view the language of the act under consideration :— "there is hereby levied on each person, * * * residing in this State," * * etc.—and the authority of *People* v. *Naglee*, (which has been acquiesced in by the Courts and Bar for ten years as a sound exposition of the taxing power of the State) that case must be overruled before this statute can be declared unconstitutional.

With reference to so much of appellant's argument as contends that if this tax is valid, the Legislature may impose a tax so large in amount as to practically expel Mongolians resident in the State from its borders, and practically bar the import from China of others of the race, we refer to the able summary of authorities by Mr. Davis, 7 Howard, 324; and we add, that taxation upon all the inhabitants of the State may become so oppressive that virtually no inhabitants of sister states or foreign countries will consent to become inhabitants of this, and yet it would not be repugnant to any constitutional provision.

This tax is not a commercial regulation within the meaning of the

Constitution of the United States. This race of people is permitted by the act under consideration, without obstruction or hindrance from the State law, to come into our ports; to then inquire as to the burdens which they will subject themselves to by becoming residents; to decide for themselves whether the burdens are equal to or greater than the benefits to be derived from becoming residents. And not until after they have formed that decision, and have mingled with and become a part of the population of the State, does the act in question impose any burdens upon them.

COPE, J. delivered the opinion of the Court—NORTON, J. concurring.

The plaintiff is a Chinese, and the defendant is the Tax Collector for the city and county of San Francisco. The suit is brought to recover the amount of a tax paid by the former to the latter, and the question presented is the constitutionality of an act of the Legislature of this State, approved April 26th, 1862. The act is entitled "An Act to protect free white labor against competition with Chinese coolie labor, and discourage the immigration of the Chinese into the State of California." It levies a monthly tax of two dollars and fifty cents " on each person, male and female, of the Mongolian race, of the age of eighteen years and upwards, residing in this State, except," etc.; and provides for its collection by a seizure and sale of property.

The case has been ably argued on both sides, and the magnitude of the question, involving, as it does, considerations of the highest importance, has devolved upon us an unusual amount of labor in its investigation. It is a question of great public interest, not only to the people of this State, but of the whole Union; and the feeling existing in regard to its determination is the natural result of a controversy so vast in its proportions, and so general in its consequences. It is contended that the act is in violation of the Federal Constitution, and embraced in the question is the subject of State and National sovereignty in matters of commerce and internal police. The provisions of the Constitution relied on are those giving to Congress the power to lay duties on imports, and to regulate commerce with foreign nations, and giving to the President,

Lin Sing *v.* Washburn.

with the advice and consent of the Senate, the power to make treaties.

It is claimed, that the authority conferred by these provisions is not only paramount, but exclusive, and that any act of State legislation affecting directly or indirectly the exercise of this authority, or amounting to the exercise of similar authority by the State, is unconstitutional and void; that these objections are applicable to the act in question, and that its passage by the Legislature was not a legitimate exercise of the power of taxation, but the assertion of a right to control foreign intercourse; that this right is vested in the General Government as a part of the power to regulate commerce, and that in passing the act, the Legislature usurped authority belonging exclusively to the Government; in short, that the act is a regulation of commerce, and being so is an interference with the regulating power of the Government, and in derogation of its constitutional authority. It is claimed on the other hand, that the police powers of the State, and particularly the taxing power, are sufficient to maintain the authority of the Legislature, and that as to such powers the State is supreme; that as the act is limited in its terms to persons residing in the State, and contains no provision compelling their departure or preventing others from coming, it is not in any sense a regulation of commerce; that all residents of the State are subject to taxation, and that in the exercise of the taxing power, the extent to which taxes shall be imposed is a matter of which the State is the sole judge; that the State has plenary power in matters of internal police, and that even if the intention had been to banish obnoxious persons from our shores, the act could not have been regarded as an infringement of the Constitution. This, we believe, is a fair though concise statement of the positions taken by counsel, and we shall be as brief in our consideration of them as the nature and importance of the subject will allow.

The act applies exclusively to Chinese, and there is no doubt that the object of the Legislature in passing it is correctly expressed in the title. This is not denied; nor could it be, in view of the act itself and the previous legislation upon the subject; and if we admit the power asserted in its passage, the right of unconditional exclusion would seem to follow as a necessary consequence. It is con-

ceded that the Constitution has vested in the Government the power to regulate commerce in all its branches, and it is settled that this power extends to every species of commercial intercourse, and may be exercised upon persons as well as property. This was decided by the Supreme Court of the United States in two cases, generally known as the Passenger Cases, (7 How. 283) overruling in that respect the case of the *City of New York* v. *Miln* (11 Pet. 102). The cases arose under laws passed by the Legislatures of New York and Massachusetts, and were argued by counsel distinguished for their ability, and decided upon great consideration by·the Court. Both of these laws imposed a tax on alien passengers, and the question was whether they were in derogation of the power vested in the Government of the United States to regulate commerce. It was decided that they were, five of the Judges concurring in the decision, and four dissenting; those concurring, however, differing to some extent in the reasoning upon which their conclusion was arrived at. The points of difference embrace one of the positions taken in the present case, and although we do not consider a decision upon it necessary in determining the case, it is proper to notice it. Mr. Justice McLean was of opinion that the power to regulate commerce was a power prohibited to the States, and vested exclusively in Congress, and cited the case of *Gibbons* v. *Ogden* (9 Wheat. 196) as having decided the point. Mr. Justice Wayne was of the same opinion, but said : " A majority of us do not think it necessary in these cases to reaffirm, with our brother McLean, what this Court has long since decided, that the constitutional power to regulate commerce with foreign nations, and among the States, and with the Indian tribes, is exclusively vested in Congress, and that no part of it can be exercised by a State." Mr. Justice Catron declined to express any opinion upon the subject, remarking that " The question whether the power to regulate commerce and navigation is exclusive in the Government of the United States, or whether a State may regulate within its own waters and ports in particular cases, does not arise in this cause." Mr. Justice Grier concurred in the opinion of Mr. Justice Catron; and Mr. Justice McKinley said : " I have examined the opinions of Mr. Justice McLean and Mr. Justice Catron, and concur in the whole reasoning

Lin Sing v. Washburn.

upon the main question." Mr. Justice Wayne, adopting the views of Mr. Justice Catron, said : " His leading positions are, that the acts of Massachusetts and New York are tax or revenue acts upon the commerce of the United States, as that commerce has been regulated by the legislation of Congress and by treaty stipulations; that the power to regulate commerce having been acted upon by Congress, indicates how far the power is to be exercised for the United States as a nation, with which there can be no interference by any State legislation.    *    *    *    Those of us who are united with Mr. Justice Catron in giving the judgments in these cases, concur with him in these opinions.    Mr. Justice McKinley and Mr. Justice Grier have just said so, my own concurrence has been already expressed, and the second division of Mr. Justice McLean's opinion contains conclusions identical with those of Mr. Justice Catron concerning the unconstitutionality of the laws of Massachusetts and New York, on account of the conflict between them and the legislation of Congress."    These cases are frequently cited in support of the doctrine that the grant of power in the Constitution, even in its dormant state, vests an exclusive authority in Congress, and operates as a prohibition upon the States.    It is obvious, however, that this point was not determined ; and all that · was decided is, that when the power has been exercised, and regulations established, the States cannot interfere.    To this extent there was a concurrence of opinion, and to this extent the decision is an authoritative exposition of the meaning of the Constitution ; and so far as it goes, we have nothing to do but to follow it.    Whether it has ever been decided that the grant of power amounts in itself to a prohibition, has been the subject of much discussion ; and notwithstanding the emphatic declaration of Mr. Justice Wayne, must be regarded as a debatable proposition.    Many of the Judges who participated in the cases relied on as deciding it are equally emphatic in asserting the contrary, and it must be confessed that the cases themselves are not sufficiently clear to remove the difficulty.    In *Wilson* v. *The Blackbird Marsh Company*, (2 Pet. 245) a different doctrine seems to have prevailed, recognizing the right of a State to exercise commercial power, where no conflict is produced with an act of Congress.    We have already stated, however, that

we do not consider an opinion upon the subject necessary in this case ; and we have only alluded to it in response to counsel, who have assumed that the point has been decided.

The laws in question in the two cases to which we have referred, required the master, owner, consignee or agent of the vessel to pay the tax, the payment to be made as soon as the vessel arrived in port. The Court held that in any view that could be taken of them, as imposing a tax either upon the vessel, the owner, or the passengers, they were equally an interference with commerce, and in violation of the authority of the Government. The assumption that a State might so use its taxing power as to obstruct the exercise of a power vested in the Government was pointedly condemned ; and the doctrine that within the range of its constitutional authority the Government is supreme distinctly enunciated. This, however, was merely a repetition of what had been decided over and over again, and must always be regarded as a vital and fundamental principle of the Constitution ; for any other doctrine would enable the States, by hostile legislation, to paralyze the energies of the Government and defeat the purposes of its formation. We shall speak of this subject more fully hereafter, when we come to consider the effect of the act complained of in this case, and its bearing as a measure of State legislation upon the power of the Government under the Constitution. At present, we shall confine ourselves to an examination of the cases referred to, so far as may be necessary in order to arrive at a clear understanding of the points decided, and the principles of the decision. We shall only state such points as we deem to be material in the consideration of this case, referring to the opinion of Mr. Justice Wayne for a full and accurate summary. It was decided that the laws in question, being in their nature regulations of commerce, and in contravention of the power vested in and exercised by the Government, were unconstitutional and void ; that the States cannot tax the commerce of the United States for any purpose, and that the commerce of the United States includes an intercourse of persons, as well as the importation of merchandise ; that State laws imposing a tax on foreigners or immigrants, such tax to be paid after the arrival of the vessel within the limits of the State, but before the passengers are landed, are laws which the

States cannot constitutionally pass ; that the regulating power of Congress includes navigation upon the high seas, and in the bays, harbors, lakes and navigable waters within the United States, and that any tax by a State in any way affecting the right of navigation, or subjecting the exercise of that right to a condition, is contrary to the Constitution and void. It was conceded that the States, in the exercise of their police powers, could pass quarantine and health laws, and laws excluding paupers, vagabonds and criminals, and that the provisions of the Constitution are not to be construed as prohibiting the enacting of laws for these purposes. Such laws are necessary in providing for the general welfare ; and although commerce may be incidentally affected by them, they were not regarded as inimical to the exercise of the commercial power. As to how far a State may go in this respect no opinion was expressed, and it would have been difficult, if not impossible, to lay down any precise or definite rule upon the subject. "No one," said Mr. Justice McLean, "has yet drawn the line clearly, because, perhaps, no one can draw it, between the commercial power of the Union and the municipal power of a State. Numerous cases have arisen, involving these powers, which have been decided, but a rule has necessarily been observed as applicable to the circumstances of each case." This probably is all that could have been said upon the subject ; and even this was not necessary as applied to the laws under consideration, as they were not passed for the preservation of health or the protection of the community. They were purely tax or revenue measures, and as their effect was to burden commerce by imposing upon it restraints and liabilities, they were held to be unconstitutional. The Government had acted upon the subject, and prescribed the rule by which it should be regulated and controlled, and this rule was the supreme law, and placed it beyond the reach of State interference. The right of a State to tax persons residing within its limits was not disputed ; but it was held that the right of taxation did not extend to persons connected with commerce, who, although within its limits, had not landed and become residents. The opinion of Mr. Justice Catron, which appears to have received the sanction of the other Judges, contains a full and able review of the commercial system of the Government, and shows

37

that its policy has always been to cultivate intercourse with foreign nations.

We have, perhaps, examined these cases at greater length and with more particularity than was necessary, but they constitute the starting point in the argument, and it was desirable to understand clearly the effect of the decision. The difference between them and the case at bar is, that in the former the person was met at the time of his arrival and taxed for the privilege of landing, and in the latter he is permitted to land and the tax levied as a condition of his residence. The person is the same—the only difference is in the circumstances under which the tax is imposed; and if this difference does not relieve the tax of its objectionable feature as an interference with commerce, we conceive that the same rule must be applied. The act is limited in its terms to Chinese residing in the State; but immigration from China will necessarily be affected by it, and it will hardly be pretended that this is a matter in which the commerce of the country is not interested. Its tendency is to diminish intercourse, without which commerce cannot exist; and it is obvious that to the extent of its influence in this respect the operations of commerce must suffer a corresponding diminution. In *Gibbons* v. *Ogden*, it was contended that commerce included nothing but traffic; but the Court said: " Commerce, undoubtedly, is traffic—but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Commerce cannot be carried on without the agency of persons, and a tax, the effect of which is to diminish personal intercourse is necessarily a tax upon commerce; and the power exercised in imposing it may be so used as not only to diminish but to destroy. If we acknowledge the power, no limitation can be affixed to its exercise, for the power to tax is a sovereign power, and wherever it exists may be exercised at the will and discretion of the sovereign. We admit that the States are sovereign, and as the result of this admission we concede to them all the power incident to the exercise of sovereign authority, except as this power has been granted by the Constitution to the National Government. As to the power thus granted, the Government is supreme,

and as a necessary consequence, the States are prohibited from interfering with its exercise; and this prohibition includes every act by which such interference may be attempted. In granting the power, the States necessarily surrendered the right to control it; and the idea that a power not granted may be used as a restraint upon the power granted is repugnant to the Constitution, and the whole theory of the Government. This doctrine has been repeatedly laid down as applicable to the taxing power, and no view can possibly be taken of it which has not already undergone the fullest and most elaborate discussion. *McCullough* v. *The State of Maryland*, (4 Wheat. 316) and *Weston* v. *The City Council of Charleston*, (2 Pet. 449) are cases in point, in the former of which the Court said: " The States have no power by taxation, or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress, to carry into execution the powers vested in the General Government." In the case of *Brown* v. *The State of Maryland*, (12 Wheat. 419) the same principle was applied, and we regard the decision as bearing with conclusive force upon the case at bar. The Legislature of Maryland passed an act requiring all importers of foreign goods by bale or package, and other persons selling the same by wholesale, bale or package, to take out a license, for which they were to pay fifty dollars. The question before the Court was the constitutionality of this act; and in an able and elaborate opinion by Chief Justice Marshall, the Court held that the act was an interference with commerce, and was unconstitutional and void. It was held that the effect of the act was to tax the goods, and that this amounted to laying a duty upon imports, which a State was prohibited from doing; and that it interfered with the regulations of Congress by imposing a burden upon the right to sell. It was not pretended that the act could stand if it came within the prohibition of the Constitution, or violated any act of rightful legislation by Congress; but it was urged that such a construction would abridge the acknowledged power of a State to tax its own citizens, or their property within its territory. In respect to the prohibition, the Court answered: " The constitutional prohibition on the States to lay a duty on imports, a prohibition which a vast majority of them must

feel an interest in preserving, may certainly come in conflict with their acknowledged power to tax persons and property within their territory.   The power and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them.   Yet the distinction exists, and must be marked as the cases arise.   Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State ; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution."   On the other point, the Court said : " We admit this power to be sacred ; but cannot admit that it may be so used as to obstruct the free course of a power given to Congress.   We cannot admit that it may be used so as to obstruct or defeat the power to regulate commerce.   It has been observed that the powers remaining with the States may be so exercised as to come in conflict with those vested in Congress.   When this happens, that which is not supreme must yield to that which is supreme.   This great and universal truth is inseparable from the nature of things, and the Constitution has applied it to the often interfering powers of the General and State Governments, as a vital principle of perpetual operation.   It results, necessarily, from this principle that the taxing power of the States must have some limits.   It cannot reach and restrain the action of the National Government within its proper sphere."

We propose, however, to consider the case in another point of view, as we think the principle underlying and controlling the decision is conclusive of the present controversy.   It will be seen that the question was not whether the goods could be stopped *in transitu,* and a tax imposed before they reached the hands of the importer, but whether, having reached his hands, they were subject

Lin Sing *v.* Washburn.

to a tax in the form of a license to sell.   Whether, in other words, it was competent for the State to impose a tax upon the right of sale, and by acting upon the importer reach the import, and subject it to a charge for revenue purposes.   It was contended for the State, that when the goods were landed, the authority of the Government ceased; that the goods passed from the control of the Government to that of the State, and were subject to any regulation the State chose to adopt.   To this it was answered, that the right to import included the right to sell, and that when the importer purchased that right by the payment of a duty to the Government, he purchased also the privilege of a market, and that taxing the market was in effect taxing the import.   It was contended, in reply, that the term " imports," in the Constitution, only applied to the act of importation; that the only right acquired from the Government was the right to introduce, and that the articles having entered the country, a tax upon them was not an interference with this right.   These positions were taken up and fully considered by the Court, and the opinion delivered is in that peculiar style of terse and convincing logic so eminently characteristic of the Chief Justice who wrote it.   It was held that the importer purchased from the Government the right to sell as well as to introduce and bring in, and that the term " imports " referred to the article imported, and not to the act of importation.   The position that the authority of the Government terminated with the entry was declared to be unsound, and it was held that this authority continued so long as the article retained its distinctive character as an import.   " The counsel for the plaintiff in error," said the Court, " contend that the importer purchases, by the payment of the duty to the United States, a right to dispose of his merchandise, as well as bring it into the country; and certainly the argument is supported by strong reason, as well as the practice of nations, including our own. The object of importation is sale; it constitutes the motive for paying the duties; and if the United States possess the right of conferring the power to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it.   The whole course of legislation on the subject shows that in the opinion of the Legislature the right to sell

is connected with the payment of duties." The power of Congress to regulate commerce with foreign nations was declared to be complete in itself, and to acknowledge no limitations other than those prescribed by the Constitution. "The power," said the Court, "is coëxtensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior. If this power reaches the interior of a State and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point where its continuance is indispensable to its value." This power is not to be understood, of course, as extending only to the articles upon which duties are paid, but to every article brought into the country under the authority of the Government. If an article is admitted free, it is because the interest of commerce, or some domestic purpose, is supposed to require it, and the right to introduce and sell is given as an equivalent for the act of importation. The power of the Government is the same in both cases, and the principle established in the case before us is, that when the article has been brought in through the agency of this power, the right to sell is a necessary incident. It was admitted that when the article had lost its character as an import, by being incorporated and mixed up with the mass of property in the country, it became subject, like other property, to the taxing power of the State. This admission, however, does not acknowledge the power of a State to single out an imported article, and subject it to a tax not imposed upon other property of the same description; and such a tax would undoubtedly come within the principle of the decision. The whole reasoning of the decision shows that a discriminating tax, the effect of which would be to give preferences and close the markets against imported articles, would be invalid; and it is impossible that any circumstance could give validity to it. The Court did not intend to distinguish between wholesale and retail dealers, nor between the importer and other persons purchasing the articles for the purposes of traffic, but to lay down a rule covering the whole ground of State

interference.  The free use of the powers vested in the Government was declared to be essential to its existence, and the intention was to lay down a rule broad enough to include every act of a State obstructing or impeding the constitutional measures of the Government.  A State may tax the property of its citizens, but it cannot tax imports ; and a tax discriminating against an imported article would be a tax upon the article as an import, and not as a part of the general mass of property.  If a State may constitutionally impose such a tax, the States together may constitutionally break up the entire commercial system of the Government ; for, admit the power, and there is nothing to prevent the imposition of a tax amounting to a prohibition.  It is clear that the power does not exist, and in whatever form its exercise may be attempted, it will be the duty of the Courts to interfere, and, by arresting the encroachment, preserve the authority of the Government.

It is immaterial for the purposes of this case whether we call persons immigrating to this country from abroad imports, or use some other term more aptly describing their relations to commerce.  The transportation of passengers is a large and rapidly increasing branch of our carrying trade, and at the different ports of the country hundreds of vessels, employed almost exclusively in this branch of commerce, arrive and depart monthly.  It cannot be denied that the Government has the same power over this as over other branches of commerce, and a large portion of the legislation upon the subject applies entirely to this branch.  It has been an object of special interest to the Government, from the time that our commerce was in its infancy, and its growth has been watched with great solicitude as promising a speedy development of the resources of the country.  It has received the encouragement of Congress in every form in which assistance could be advantageously rendered, and the benefits resulting from it are felt and acknowledged by the whole nation.  It has always been the policy of the Government to encourage immigration, and the most liberal system of laws has been adopted to induce foreigners to come to the country for the purpose of settlement and traffic.  The fruits of this system are to be seen in the rapid increase of our population, the settlement and improvement of our fertile and extensive domain, and the millions of wealth

added year after year to every branch of industry and trade. The results of the system demonstrate its wisdom; but whether wise or unwise, it is a system which the Government had the right to adopt, and with which no State can constitutionally interfere. The whole subject of trade and intercourse has been confided to the national will, and if a State may so use its reserved powers as to defeat the operations of this will, the Constitution, instead of being a practical instrument, is a shadow and a myth. If any effect is to be given to it as a grant of power, the line which marks the limit of the grant is the line beyond which State action cannot be extended; it is the dividing line between the powers reserved and the powers granted. The power to regulate commerce is among the powers expressly enumerated, and having passed from the States to the Government, no State can exercise any part of it, except, perhaps, as the Government may assent to its exercise in particular cases. Commerce is a unit, its several parts so united and bound together as to be inseparable; and as intercourse is a component part of commerce, the power to regulate commerce includes the power to regulate intercourse. The power comes from the grant, and is coëxtensive with the subject to which it relates; and whether exercised to encourage immigration, or for any other purpose within the range of commercial intercourse, the States are prohibited from interfering. It may be thought inaccurate to say that a law passed to induce immigration for the purpose of settlement is a regulation of commerce; but it is clear that the Government, in virtue of its commercial power, may pass such a law. Immigration, either temporary or permanent, is an essential ingredient of intercourse and traffic, and the power to regulate commerce implies the power to regulate both as to persons and to goods. This is the leading idea of the Passenger Cases, and the necessary inference from these cases, taken in connection with *Brown* v. *The State of Maryland*, is that when the persons have once entered, the States have no power to tax them out. "Except to guard its citizens against diseases and paupers," said Mr. Justice McLean, "the municipal power of a State cannot prohibit the introduction of foreigners brought to this country under the authority of Congress." Mr. Justice Wayne, referring to the argument of counsel, said: "It was assumed that a

State has unlimited discretion, in virtue of its unsurrendered police power, to determine what persons shall reside in it. Then it was said to follow, that the State can remove all persons who are thought dangerous to its welfare ; and to this right to remove it was said the right to determine who shall enter the State is an inseparable incident. That erroneous proposition of the discretion of a State in this matter, has led to all the more mistaken inferences made from it. The error arose from its having been overlooked that a part of the supreme police power of a nation is identical, as I have shown it to be, with its sovereignty over commerce. Or, more properly speaking, the regulation of commerce is one of those particular rights collectively placed in the hands of the sovereign for the good of the State. Until it is shown that the police power in one of its particulars is not what it has just been said to be, the discretion of a State of this Union to determine what persons may come to and reside in it, and what persons may be removed from it, remains unproved. It cannot be proved," etc. Mr. Justice Catron said that in the exercise of its authority over commerce the Government is supreme, and may admit or refuse foreign intercourse, either partially or entirely. The opinion delivered by him contains so full and thorough an examination of the legislation of Congress, and the action of the Government upon the subject of commerce, we deem it unnecessary to go over that ground. Most of the regulations upon the subject are general in their nature, referring to no particular country, but inviting intercourse with all nations, and excluding none.

It must be admitted that the act before us is a measure of special and extreme hostility to the Chinese, and that the power asserted in its passage is the right of the State to prescribe the terms upon which they shall be permitted to reside in it. This right, if carried to the extent to which it may be carried if the power exists, may be so used as to cut off all intercourse between them and the people of the State, and obstruct and block up the channels of commerce, laying an embargo upon trade, and defeating the commercial policy of the nation. The act is sought to be maintained as a police regulation; but this branch of the police power has been surrendered to the Government as a part of the power to regulate

commerce, and its exercise by a State is incompatible with the authority of the Government. We may dismiss from the case the question of the power of the States to exclude obnoxious persons, such as paupers and fugitives from justice, for it nowhere appears that the Chinese as a class are of that description; nor does the act pretend to deal with them as such. It imposes upon them a tax, but contains no provision denying to them a residence in the State; and the question is not whether they can be excluded as burdensome or dangerous persons, but whether they can be taxed for the privilege of residing here, without reference to their condition or character. That they may be taxed as other residents is not disputed, but that they may be set apart as special subjects of taxation, and be compelled to contribute to the revenue of the State in their character of foreigners, is a proposition which cannot be maintained. If this may be done, there is no restriction upon the power that does it, and a tax may be imposed which no human industry can pay, precluding all intercourse, and making it as impossible as if it were positively prohibited. The question is one of power, and if we admit the power we must admit it in its whole extent, as a power complete in itself, to be exercised at the discretion of the Legislature, and subject to no limitation or restraint. If it exists, it may be exercised upon all foreigners residing in the State, and may be so exercised as to bar the door of foreign commerce as effectually as the Government could do it by issuing its mandate and closing the ports. The fact that a power may be abused is no evidence that it does not exist; but where an inferior jurisdic tion asserts a power in conflict with that of a superior jurisdiction, the inference that the power asserted does not exisit is inevitable. And to determine whether there is a conflict or not, the power must be considered with reference to its consequences, for its effect when carried out is the only criterion by which a judgment can be formed.

It is said that the power of taxation in a State is a power incident to its sovereignty, and that the free exercise of this power upon persons and property within its limits is essential to its existence. We admit the importance of the power, and concede that no unnecessary restrictions should be placed upon it; but what has been

said shows that like other State powers it must be exercised in subordination. to the powers vested in the Government.   When a State undertakes to tax commerce, the question is not one of territorial jurisdiction, and there is no more reason in saying that a State may thwart the measure of the Government by a tax, than to say that it may do so through the agency of some other power. The authority of the Government is not to be measured by State lines, but by the provisions of the Constitution, and the limitations upon State power are to be measured by the same instrument, and not by geographical surveys and boundaries.   This is the doctrine so forcibly laid down in *Brown* v. *The State of Maryland*, and the principle there established in relation to property is equally applicable to the case of persons.   The latter are brought in by the same power that admits the former, and as subjects of State taxation stand precisely upon the same footing, and are entitled in an equal degree to the protection of the power under which they enter.   In protecting them it protects itself, and to abandom them to an unlimited exercise of the taxing power of the States, would be to abandon itself to certain destruction.

We have already stated that most of our laws regulating commerce are general in their nature, and there is no doubt that they apply with as much force to our intercourse with China as to that with other nations.   Such must have been the opinion of this Court in the case of the *People* v. *Downer*, (7 Cal. 169) which was decided upon the authority of the Passenger Cases; and the action of the Government seems to have been in accordance with this view. Revenue from that source has been regularly collected at the different ports; and it has been the uniform practice of the Government to admit imports from China and imports from other countries upon the same terms.   In February last, Congress passed an act in relation to the " Coolie trade," prohibiting our vessels from transporting persons leaving the country under constraint, but expressly authorizing voluntary immigration.   In addition to this, there is a treaty of "peace, amity and commerce," between the two nations, restricted on the part of China, so far as commerce is concerned, to certain ports and places, but open and unrestricted on our part.

We have examined the cases cited by the Attorney General, and

see nothing in any of them to lead us to a conclusion different from that at which we have arrived. The doctrine laid down in *The City of New York* v. *Miln*, that persons were not the subjects of commerce, was expressly overruled in the Passenger Cases, and the authority of these cases has never been questioned. The License Cases (5 How. 504) were decided upon the ground that the laws in question were police regulations, and related to a subject peculiarly within the authority of the States to regulate and control. The decision has never been supposed to be in conflict with *Brown* v. *The State of Maryland;* and since it was rendered, the latter case has been affirmed in *Almy* v. *The State of California.* (24 How. 169.)

It follows that the act in question is unconstitutional, and the judgment of the Court below is reversed, and the cause remanded for further proceedings in conformity with this opinion.

NORTON, J.—The Supreme Court of the United States decided, in what are called the Passenger Cases, that a State had no power to impose a tax upon a foreigner for the privilege or right of coming into the State. The decision was made by the concurrence of a bare majority, that is, of five out of the nine Judges. The majority held that such a tax was an infringement upon the power of Congress to regulate commerce, which was held to include intercourse, and to involve the right of determining under what conditions foreigners should be allowed to come to the United States. The minority held that the imposing of such a tax was but the exercise of the undoubted right of taxation belonging to the several States, and was not an infringement upon any power granted by the Constitution to Congress. It is obvious that it was a nice and difficult question that could divide so near equally the opinions of that tribunal, and striking reflections and arguments upon the opposite sides are presented in those differing opinions. But the question having been decided by that Court, to whom its decision belongs under the Constitution of the United States, the State Courts have no other duty than to follow that decision. The Supreme Court of the United States also decided in the case of *Brown* v. *The State of Maryland*, that a State law requiring a license to be obtained for the sale of

imported goods in the original packages was void, because it had a tendency to discourage and prevent the importation of foreign goods, and was thus an infringement upon the constitutional right of Congress to regulate commerce.   The Court held that the right under a law of Congress to import goods necessarily included the right to sell them in the country, and thus to have them become a part of the property of the country.   That the right to import goods was a practical and substantial right, and not a useless form, as it would be if the goods, upon being landed, could not be put into market.

So long as these two decisions of the Supreme Court of the United States stand, any State law must be void, the purpose and effect of which is to prevent foreigners from coming to and residing in the State.   The laws and regulations of Congress which allow foreigners to come to this country, necessarily allow them to remain here, in the same manner as those laws and regulations which allow foreign goods to be imported, allow them to be sold in and to become a portion of the property of the country.   It would be an empty sound to say that the several States cannot pass any law to prevent foreigners from coming here, if they may pass laws which will compel such foreigners to depart as soon as they arrive.

One of the purposes of the law under consideration is stated in the title to be to " discourage the immigration of the Chinese into the State of California," and there can be no doubt but that the tax imposed by the law on these persons for the mere right to reside here is an appropriate and effective means to accomplish the purpose announced in the title.

The case of the *People* v. *Naglee* (1 Cal. 232) referred to by counsel, decided that a State law requiring foreigners to take out a license for the privilege of working the gold mines was valid.   It did not decide that they could be taxed merely for the privilege of residing in the State.   The question not being the same, it is not necessary to examine the reasons upon which it is based.

The right of the several States to exclude Africans, also alluded to by counsel, was held by the Supreme Court of the United States in the Passenger Cases to result from certain provisions of the Constitution, and not to be applicable to other persons.

I therefore concur with Mr. Justice Cope that the law in question

is void, and that the judgment should be reversed and the cause remanded for further proceedings.

FIELD, C. J. dissenting :—

I am compelled to dissent from the judgment of my associates in this case. I do not regard the Act of April 26th, 1862, as in conflict with any provisions of the Constitution of the United States or of this State. The act, in my judgment, merely provides for a tax upon a certain class of residents, and is the legitimate exercise of the taxing power of the State. It does not interfere with the landing of Mongolians within the State ; it does not impose any tax upon them as emigrants ; nor is it directed to their exclusion from the State. The title of the act, it is true, is open to criticism, but the title is never held to control the legislative intent. "Originally," as I had occasion to observe in another case, "it was considered as constituting no part of the act, 'no more,' says Lord Holt, 'than the title of a book is part of a book.' (*Willis* v. *Welkins*, 6 Mod. 62 ; *Rex* v. *Williams*, 1 W. Bl. 85 ; 3 R. 35—Poulter's case.) It was usually framed by the Clerk of the house in which the bill first passed, or by the Judges after the receipt of the King's answer to the petition of the Commons, and was intended only as a convenient mode of reference. At the present day it is seldom the subject of legislative discussion, and is evidence of little more than that the originator of the act saw fit to designate it by the particular name. *Attorney General* v. *Lord Weymouth*, (1 Ambler, 22.) The legislative intent is to be sought in the purview or body of the act, and where the language in this part is clear and unambiguous, no other part can avail to contradict or control it. The title can be resorted to only in cases of ambiguity, and is then of slight value. 'It can only be used,' says Sedgwick on Statutes, 'for the fact of the makers having given a law a certain name, if that fact can render any assistance in doubtful cases.'" (*Ex parte* Newman, 9 Cal. 522.)

Looking, then, to the purview or body of the act, I find that it provides only for a tax upon a certain class of residents. It does not impose a tax upon Mongolians, who may happen to be within the State for a temporary purpose, or passing through it to an inte-

rior State, but upon such Mongolians as have become residents of the State; and not upon all of them. It does not impose a tax upon those who may take out licenses to work in the mines, or to prosecute any other business, nor upon those who may be exclusively engaged in the production of sugar, rice, coffee or tea; nor upon persons under the age of eighteen years. In what way this act interferes with the power of Congress to regulate commerce with foreign nations I am unable to perceive. In the cases of *Smith* v. *Turner*, and *Norris* v. *The City of Boston*, (7 How. 283) commonly known as the Passenger Cases, the Supreme Court of the United States held that foreigners arriving at any port of the United States from foreign ports were, whilst they remained on board of the vessels in which they arrived, exempt from State taxation, and that the acts of the State imposing a tax upon them, or upon the master of the vessel on their account, to be paid before they were landed, were unconstitutional and void, as being in their nature regulations of commerce. But between the acts considered in those cases and the act of this State there is a wide difference. By the former acts the tax was to be paid as a condition of landing the passengers. Congress had provided by its legislation for the transportation of passengers from foreign ports to the ports of the United States as a branch of commerce; the State laws interfered with this legislation, and imposed other conditions; they were therefore encroachments upon the exclusive power vested in Congress under the Federal Constitution. The act of this State imposes no tax as a condition of the landing of Mongolians; nor does it require their removal from the State in case of their refusal to pay the tax levied. In case of its nonpayment the act authorizes—just as it does in the case of the nonpayment of poll-taxes levied upon other residents of the State—a seizure and sale by the Collector of the personal property of the delinquent.

In the Passenger Cases it was conceded by the Judges of the Supreme Court, who expressed any opinions, that so soon as the foreigners landed and became, as residents, a portion of the population of the State, they were subject to the laws of the State, and to such taxation as the State by her legislation might direct. "When passengers leave the ship," said Mr. Justice McLean, "and mingle

with the citizens of the State, they become subject to its laws."
(7 How. 405.) "It is also insisted," observed Mr. Justice Catron,
"that the States may tax all persons and property within their
respective jurisdictions, except in cases where they are affirmatively
prohibited. This is a truism not open to denial. Certainly the
States may tax their own inhabitants at discretion, unless they have
surrendered the power. (452.) "It is admitted," is the language
of Mr. Chief Justice Taney, "that they (passengers who were for-
eigners) are not exempt from taxation after they are on shore."
(491.) "It seems conceded," declares Mr. Justice Woodbury,
"that if this, as a tax, had not been imposed till the passenger had
reached the shore, the objection urged to the law must fail." (531.)

The case at bar appears to me, from the language cited, to be
expressly excepted from the operation of the decision of the Court
in the Passenger Cases. It was not considered by the Judges as a
question open to argument, that foreigners, after they had ceased to
be passengers, and had become residents, were subject to the taxing
power of the State. When their condition as passengers was ended,
the power of Congress over them, as subjects within its commercial
regulations, was exhausted, and the power of the State began. I
concur fully, therefore, in the opinion of Mr. Justice Bennett in
*People* v. *Naglee,* (1 Cal. 237) and I do not see how this Court can
hold the law under consideration to be in conflict with the Constitu-
tion of the United States, without overruling the decision in that
case. The question there presented and decided was the constitu-
tionality of a law of the State requiring foreigners to pay a license
tax for the privilege of working in the mines. No such license tax
was exacted from other residents for the privilege, and to uphold
the law it became necessary to consider the power of the State to
tax foreigners as a class, after they had become residents of the
State, and this subject was ably and elaborately considered by Mr.
Justice Bennett. After observing that the power of taxation, in
independent nations, is unrestricted as to things, and with the excep-
tion of foreign embassadors and agents, and their retinue, is unlim-
ited as to persons, and citing from the Passenger Cases, substantially
as I have done, the learned Justice says : "The above, then, being
the inherent power of taxation in every independent community,

and this power not having been parted with by the people of the States when they organized the Federal Government, it consequently extends to all persons within the territorial jurisdiction of the respective States, and embraces foreigners residing therein as well as citizens. The power being conceded, the limitation and extent thereof must, as to subject matter, persons, amounts and times of payment, rest in the discretion of the Government of each State ; and if a State, enacting laws in pursuance of this acknowledged power, sees fit to impose the burden of taxation upon a portion of the persons within the sphere of its jurisdiction, and specially exempt others, its legislation, even though it might be unequal and unjust, would yet be no infringement of the Constitution of the United States."

Much stress is placed upon the fact that commerce, as defined by the Supreme Court, not only means traffic, but also intercourse. Thus, in *Gibbons* v. *Ogden*, (9 Wheat. 567) the Chief Justice said: " Commerce undoubtedly is traffic ; but it is something more—it is intercourse. It describes the commercial intercourse between nations and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." This language was used in answer to the position of counsel in that case, who contended that the meaning of the word was limited to traffic, to buying and selling, or the interchange of commodities, and did not comprehend navigation. It is commercial intercourse to which the Court had reference; and though this embraces the intercourse of persons for the purposes of trade, it never was intended to include such a control over the condition of foreigners who have become residents of a State, and their personal intercourse with other residents, as to exempt them from taxation by State legislation. In the Passenger Cases reference is repeatedly made to the language used in *Gibbons* v. *Ogden*, that commerce is intercourse; and yet it was conceded by the Judges in those cases, as I have already shown by citations from their opinions, that so soon as foreigners become residents of a State, they are subject to her laws and to such taxation as she may authorize.

The objection that if the right to levy the tax in question be sustained there is no limit to the power of the State, and the tax

may be made so great and oppressive as to drive all Mongolians from the State, does not alter the question. All power, wherever lodged, is subject to abuse. No one doubts that the State may impose a license tax upon certain professions and trades, and yet it would be an unsound argument to urge against the power of the State, that if admitted it might be abused, and the tax placed so high as virtually to destroy them. " The sure guarantee," said Mr. Justice Bennett, in the case from which I have already cited, " against the abuse of this power, as of all other powers, exists in the fact that an unjust, partial or impolitic law can, under our system of government, be but of short duration, after it shall have begun to react upon the people or destroy the business of the community." " It is admitted," said Chief Justice Marshall, in *McCullough* v. *Maryland*, (4 Wheat. 428) " that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the Government may choose to carry it. The only security against the abuse of this power is found in the structure of the Government itself."

For the reasons stated, I am of opinion that the judgment of the Court below should be affirmed.